## LANNING v. OSBORNE et al.

### (Circuit Court, S. D. California. September 14, 1896.)

1. **WATER COMPANIES—ESTABLISHMENT OF RATES.**

   No corporation appropriating water under and by virtue of the constitution and laws of California for sale, rental, or distribution has the right to exact any sum of money or other thing in addition to the legally established rates, as a condition upon which it will furnish to consumers water so appropriated.

2. **SAME—RIGHTS OF CONSUMER.**

   Since by Civ. Code Cal. a consumer whose right to demand a supply of water from a company has once vested is protected from the injury of having his supply cut off, he may prevent, by injunction, if need be, the distributor from disposing of it to others beyond the capacity of the system.

3. **SAME.**

   Should the rates fixed by the county board of supervisors for the sale, rental, or distribution of water appropriated for those purposes, as provided by Act Cal. March 12, 1885, be unreasonable, a person aggrieved may have the rates annulled by the court, and the question be again remitted to the board.

4. **SAME.**

   Where water is appropriated and furnished by a public or quasi public corporation, the water being charged with a public use, the rates must be established in pursuance of law, and no attempt to fix them by private contract with consumers is of any validity.

5. **SAME.**

   Since Act March 12, 1885, provides that, in case of failure of the board of supervisors to establish rates for furnishing water as provided in the act, the rates established by the company shall control, the latter is not divested of the power to so fix rates by the fact that before the passage of the act it contracted to furnish water at a lower rate, the persons with whom it so contracted being chargeable with notice that the constitution conferred power upon the legislature to prescribe the manner in which such rates should be established.

Works & Works, for complainant.

C. H. Rippey, Haines & Ward, and J. S. Chapman, for defendants.

ROSS, Circuit Judge. The bill in this case alleges, among other things, that the San Diego Land & Town Company, of which the complainant is the duly appointed and qualified receiver, is a corporation duly organized and existing under and by virtue of the laws of the state of Kansas, and at the times mentioned in the bill was doing business in the state of California; that during all the times mentioned the company was, and still is, the owner of valuable water, water rights, reservoirs, and of a pipe system for furnishing water to consumers for domestic, irrigation, and other purposes, and of a franchise for the impounding, sale, distribution, and disposition of such waters to the defendants and other consumers, and to the city of National City, in this state, and its inhabitants; that its main reservoir and supply of water is, and was at the time mentioned, situate in a small stream called the Sweetwater River, in San Diego county, distant about five miles from National City, and that its system of reservoirs, mains, flumes, aqueducts, and pipes covers and can supply a limited amount of territory, consisting of certain farming lands with

in and outside of National City, and in part of the residence portion of that city; that the company, in procuring the water and water rights, reservoirs, and distributing system owned by it, and in preparing itself to supply consumers with water, expended, up to January 1, 1896, $1,022,473.54, which was reasonably necessary for those purposes; that by the expenditure of that sum of money the company procured and owns, subject to public use, and the regulation thereof by law, the property mentioned; that the capacity of its reservoir is 6,000,000,000 of gallons of water; that the defendants are the owners, respectively, of tracts of land under the company's water system, most of the defendants owning and holding small tracts of only a few acres each; that each of the defendants has, by purchase or otherwise, become the owner of a right to a part of the water appropriated and stored by the company necessary to irrigate his tract of land, and is liable to pay for the use thereof such rental as the company is entitled to charge and collect; that the annual expense of operating and keeping in repair the reservoir and water system of the company and of furnishing the consumers with water is, including interest on its bonds and excluding the natural and necessary depreciation of its system, $33,034.99; that in order to pay the company the amount of its annual expenses and an income of 6 per cent. on the amount actually invested in its water, water rights, and water system up to the 1st day of January, 1896, it is necessary that rates for the water sold and consumed be so fixed as to realize to the company the sum of $119,791.66; that the total amount that was realized by the company from sales of water and water rights and from all other sources on account of its business of supplying water to consumers outside of the city of National City for the year ending January 1, 1896, was about $13,000, and that no more than that sum can probably be realized for the year ending January 1, 1897, at the rates now prevailing; that all of the mains and pipes of the company, and other parts of its property, used in furnishing water to consumers, are perishable property, and require to be replaced at least once in 16 years, and require frequent repairs; that in order to acquire the water and water rights and to construct its system of waterworks, the company was compelled to and did borrow $300,000, and that it is compelled to pay, as interest thereon, $21,000 annually, which sum must be realized from the sale of its water, and is a part of its operating expenses; that the proportionate share of the revenues of the company that should be raised by water rates within the limits of National City, as compared with the revenues that should be raised and paid as rates by consumers outside of that city, is about one-third; that the amount that can be realized from that city and its inhabitants per annum from the rates now prevailing under the ordinance established by that municipality is about $10,715, and no more; that the value of the water, water rights, reservoirs, franchises, and property necessary for the proper operation of the business of the company and now held by it is $1,100,000, and that the same is necessary for the use of the company in furnishing water to the defendants and other consumers; that the city of National City is a municipal corporation of the sixth class, organized under the general laws of the state of California, and that the rates to

be charged for water within the city are fixed by its board of trustees, as provided by law; that the company commenced to furnish water to consumers in the year 1887; that it was then informed by its engineer that its system and the supply of water that could be stored thereby would furnish water to consumers sufficient to irrigate 20,000 acres of land, and would supply such water, in addition thereto, as would be necessary for domestic use inside and outside of the city of National City; that the company was then unfamiliar with the operation of a plant and system of the kind constructed by it, and did not know what the cost of operating and maintaining the same would be; that, relying upon the report and estimate of its engineer, and believing that by fixing and charging an annual rate of $3.50 per acre for irrigation, it could meet its operating expenses, and pay it some interest on its investment, it fixed and established, and has since charged, the rate of $3.50 per annum, and no more, until January 1, 1896; that, instead of being able to supply from its system water sufficient to irrigate 20,000 acres, it has been demonstrated by actual experience that the system will not supply water sufficient to irrigate to exceed 7,000 acres, together with the water demanded for domestic use, and probably not to exceed 6,000 acres, although there are about 10,000 acres under the system susceptible of irrigation; that at the rate of $3.50 per acre, if water should be demanded and used upon the whole of the lands which the system is able to supply with water, and rates are allowed in National City equally high for domestic use and irrigation, the company would not be able to pay its operating expenses and maintain its plant and system, and that the company has been, and still is, under the rates mentioned, losing money every year, and its plant and system has been and is gradually going to decay from natural depreciation consequent upon its use in supplying consumers with water, without any revenue or means being provided for replacing the same, whereby the system and the money invested by the company therein will be wholly lost to it, and it will, if the rate of $3.50 per acre be maintained, be compelled to furnish water to consumers at an actual and continual loss; that, in order to pay the costs of operating the plant and maintaining the same and pay the company a reasonable interest on its investment, or a reasonable sum for its services in supplying water to the defendants and other consumers, it will be necessary for it to charge a rate per acre per annum of not less than $7 for irrigation purposes, which sum is a reasonable rate for consumers to pay, and the smallest amount for which the company can furnish the water without loss to it; that by the laws of the state of California the board of supervisors may, upon the petition of 25 inhabitants who are taxpayers of the county, fix the rate of yearly rental to be collected by the company, but no such petition has ever been presented or rates fixed in the case of the company; that, for the reasons stated, the company gave notice to the defendants that on January 1, 1896, it would establish a rental of $7 per acre per annum for water supplied to their, and each of their, lands for irrigation, and that from and after that date they, and each of them, would be required to pay that sum for the irrigation of their and each of their lands, and that the receiver, after his appointment, and before the

date mentioned, gave a similar notice; that the defendants, and each of them, refused to pay the rate of $7 per acre, and maintained that neither the company nor the receiver has any legal right to increase the amount of rental to be paid by them, or any of them, and that the rate of $3.50, established and collected by the company, must be and remain the established rate of rental until a rate is established by the board of supervisors of the county in which the plant is situated; that an increase of the rate is absolutely necessary to enable the receiver to maintain and operate the plant and pay the expenses of its maintenance and operation, as he is required by law to do; that, in order to enforce the payment of the rate so fixed, the receiver caused the water to be shut off from the premises of the defendants, and each of them, until such rates are paid, and that the defendants threatened to, and will, unless restrained from so doing by this court, commence suits in the superior court of the county of San Diego, state of California, to compel the receiver to turn on and furnish water to their lands without the payment of $7 per acre rental on the ground that they are entitled to the use of the water for $3.50 per acre, and for damages for cutting off the said supply of water; that the rights of the defendants are the same, and the determination of the question of the right of the company and of the receiver to increase the rate of rental to be charged and collected affects all of the defendants in the same way and to the same extent, except that the quantity of land owned by the several defendants is different; that the bringing of such suits by the defendants separately will involve the company, the receiver, and the defendants in a multiplicity of suits, and put them, and each of them, to great and unnecessary cost and expense, and seriously hinder the receiver in the proper operation and management of the property of the company and the settlement of its outstanding debts, liabilities, and obligations, while all of the questions involved in such litigation, and the rights of all of the parties in interest, can be better settled and determined in one suit, and vexatious litigation and unnecessary expense and consequent unnecessary interference with the receiver's management and control of the property and business of the company be thereby avoided; that the proposed increase in rates will add to the revenue and earnings of the company from the sale and distribution of the water from its system, with the amount of land now under irrigation, not less than $14,000 per annum, and upon the whole of the lands that can be irrigated under the system of the company not less than $21,000 per annum.

The prayer of the bill is that the defendants, and each of them, be enjoined from prosecuting in the state courts or elsewhere separate actions against the receiver or the company growing out of the matters alleged; that the defendants, and each of them, be required to appear in this suit, and set up any claims they may have against the right of the receiver or the company to increase the rate for water so furnished, and that it be finally decreed by the court that the receiver and the company have the right to increase the rate to any reasonable sum, and that the sum of seven dollars per acre per annum is a reasonable rental to be charged for irrigation, and that the defendants and each of them be required to pay that rate as a condition upon which

water shall be furnished them, and for such other and further relief as the nature of the case may demand.

The answer of the defendants, to which exceptions are taken, alleges, among other things, that the purposes for which the San Diego Land & Town Company was incorporated are "the encouragement of agriculture and horticulture; the maintenance of public works; the maintenance of a public and private cemetery; the purchase, location, and laying out of townsites, and the sale and conveyance of the same in lots and subdivisions or otherwise; the supply of water to the public; the erection of buildings, and the accommodations and loan of funds for the purchase of real property; the establishment and maintenance of a hotel; the promotion of immigration; the construction and maintenance of sewers; the erection and maintenance of market houses and market places; the construction and maintenance of dams and canals for the purpose of waterworks, irrigation, or manufacturing purposes; the conversion and disposal of agricultural products by means of mills, elevators, markets, and stores or otherwise; the accumulation and loan of funds; the erection of buildings, and the purchase and sale of real estate for the benefit of its members; and the construction and maintenance of such other improvements as may be necessary or desirable for the proper exercise of any or all such corporate purposes." The answer admits the appropriation of the waters in question by the company for the purposes stated in the bill, and alleges that the company acquired a portion of its reservoir site by condemnation proceedings under the laws of the state of California, and that it has exercised, and does exercise, its franchise to furnish the water by virtue of the comity of the state of California, and subject to the conditions prescribed by the constitution and laws of that state. The answer avers that the quantity of farming and orchard lands within and without National City lying under the flowage of the company's reservoir and within the reach of its supply of water is about 12,000 acres; that the capacity of the reservoir is sufficient to supply water needed for the irrigation of 9,000 acres of land, and also for the domestic and other uses and needs of a population when settled thereon and in National City of at least 20,000 persons; that of the 12,000 acres of farming and orchard lands lying under the company's system, the company, in January, 1887, owned and held for the purpose of sale, use, and profit about 7,000 acres; that the portion of the territory of National City that it in January, 1887, laid out into town lots comprised 6,691 lots, of which the company then owned 2,849; that the lands of the company owned by it in January, 1887, irrigable from its reservoir and distributing system, are situate in the Sweetwater valley, in Chula Vista, and in National City, and within the boundaries of National ranch, in the county of San Diego, and also in Otay valley, in the same county, adjoining National ranch on the south, and in the territory known as "ex-Mission Lands," adjacent to National City on the north, and that the lands described, together with the lots owned by the company, form virtually one continuous tract extending from near the base of the Sweetwater reservoir westward to the Bay of San Diego, and from the Otay valley on the south to the boundaries of the city of San Diego on the north and

west; that the lands and lots, as owned in January, 1887, by others than the company, are in detached parcels, scattered among the lots and lands of the company; that the lands of the company were, in January, 1887, entirely unsettled, and in their natural state, and were almost entirely arid, and of but little value without water for irrigation; that the city lots owned by the company were at the same time vacant and unimproved, and of little value except in anticipation of settlement of the lands under the water system, and of the anticipated growth of the population of National City; that the lands and lots belonging to the defendants and others than the company were also at that date largely unsettled and in their natural state, and were of the same general character as those of the company; that the company, being desirous of selling its lands and lots, and of taking advantage of the speculative conditions then prevailing in Southern California, made the appropriation of the waters of the Sweetwater river, and planned and executed the construction of the reservoir and water system primarily to serve and settle its own lands and lots, and the inhabitants who, by promise of such water, should be induced to purchase the same, and that the company's water system was constructed to serve incidentally only the lands of others than the company; that in part execution of its project the company laid out and platted its tract known as "Chula Vista," consisting of about 5,000 acres, in blocks of 40 acres each, and subdivided the blocks into lots of 5 acres each, and laid pipes therein so as to reach and serve each 5-acre lot; that in further execution of its project, the company laid pipes in the streets of National City so as to reach its vacant city lots, as well as any inhabited lot along its lines of pipes, and also so as to reach its farming lands within the city, and extended its pipes through the city to serve and irrigate 390 acres of the ex-Mission lands, and also laid pipes in the Sweetwater and Otay valleys, and elsewhere in National Ranch, to reach and serve its lands there situated; that nine-tenths of the company's distributing pipe system, when laid and ready for operation in February, 1888, was so laid in anticipation of future use and payment for the water, and not for any use or demand then existing; and that, when laid, it was, and to a great extent still is, ahead of the demands therefor, and that much thereof has lain unused.

The answer further alleges that from the inception of its enterprise until January 1, 1896, the company held its farming and orchard lands and its lots in National City for sale, and, as an inducement to their purchase, both privately and publicly and continuously represented that the water of its system was piped to and over its lands and lots, and was and would be supplied to purchasers thereof for irrigation at the rate of $3.50 per acre per annum for farming and orchard lands and for city lots, in ample quantity, and at cheap rates; that the lands of the company in the Sweetwater and Otay valleys and in the ex-Mission without water have at no time been worth more than an average of $35 per acre, and in Chula Vista no more than from $75 to $100 per acre; that with the appurtenant water supply the company has at all times since early in the year 1887 held its raw lands in the Sweetwater and Otay Valleys and in the ex-Mission at an average

price of $250 per acre, and in Chula Vista at prices ranging from three to five hundred dollars per acre, except that it offered and sold about six 5-acre tracts of its Chula Vista lands at $150 per acre as an inducement to the first few purchasers to locate thereon; and has at all times held its lands other than town lots within the city of National City, together with the annexed water supply, at from $350 to $500 per acre.

The answer alleges that prior to the bringing of this suit the company, upon the representation that the annual rate of water for irrigation was and shall be $3.50 per acre, sold to certain of the defendants and their predecessors in interest certain of its lands, aggregating 714 acres, at the enhanced prices mentioned, with the easement of water annexed as an incident and appurtenant thereto, and that each purchaser thereof respectively relied upon the representations of the company that the annual rate for water to be supplied for irrigation was and would remain not higher than $3.50 per acre; and that in each of those cases the company, prior to making its conveyance, connected the land so sold with the actual flow of water of its system, both for irrigation and domestic and other uses; and in respect of lands so sold by the company in Chula Vista it exacted from and imposed upon each of the purchasers his obligation to erect a residence thereon at once, to cost not less than $2,000.

The answer further alleges that up to December, 1892, the company made no express or separate grant of "water rights" as appurtenant to the lands so sold by it, but granted the easement of the flow and use of the water from its system as an appurtenant to the land sold, "and contracted for and received compensation for the land and appurtenant water right in a single price for both"; that after December, 1892, the company, in all cases of sales of its lands, by an express contract in writing, specifically sold to those defendants who purchased lands from it that appurtenant water right, and that each of such contracts contained the following provisions (the description of the land and the price for the same with the water being adapted to each case, respectively), to wit:

"That in consideration of the stipulation herein contained and the payments to be made as hereinafter specified, the party of the first part (the company) hereby agrees to sell unto the party of the second part, and the party of the second part agrees to purchase of the party of the first part, the following real estate. to wit [description], together with a water right to the one acre foot of water per annum for each and every acre of said above-described real estate, to be delivered by the party of the first part through its pipes and flumes at a point ——; said water to be used exclusively on said real estate, and to become and be appurtenant thereto, and not to be diverted therefrom: provided, that the party of the first part may change the place of delivery of said water so long as the same is near the highest point of said land. For which land and water right the party of the second part agrees to pay the sum of —— dollars. And the party of the second part further agrees and binds ——self, —— —— heirs, executors, and assigns, to pay the regular annual water rates allowed by law and charged by the party of the first part for the water covered by said water rights, whether said water is used or not, and to pay for all water used on said land for domestic purposes monthly under such rules and regulations for the delivery of water to consumers as the party of the first part may from time to time make."

The answer further alleges that the title to about 970 acres in the aggregate of lands lying outside of National City and acquired by certain defendants was not derived from the company, in respect to which the company furnished water up to December, 1892, without exacting a price for a water right, but voluntarily annexed the perpetual easement of the flow and use of water from its system to such lands, and voluntarily treated those tracts as it did all tracts sold by it to other defendants; and that from the beginning of its service of water the only water rates actually established and collected by the company for water furnished by it to land not sold by it have been the same as for water supplied to lands it sold.

The answer further alleges that from and after December, 1892, the company refused to furnish water to irrigate other or further lands under its system not owned or sold by it, except upon the payment of a sum in gross for the water right over and above the uniform annual rate as actually established and collected from all of the lands under the system; that it first fixed the price of such water rights at $50 per acre, and later raised the same to $100 per acre; and that from December, 1892, it furnished no water to irrigate any of the lands not sold by it, except upon payment of the price fixed by it for a water right under a contract for the sale of such water right containing the following provisions (the filling of the blanks being adapted to each case), to wit:

"That the party of the first part (the company) agrees to, and does hereby, sell to the party of the second part a water right to one acre foot of water per acre per annum for each and every acre of the real estate hereinafter described, to be delivered through the pipes and flumes of the party of the first part, ———, for the sum of ——— dollars, payable as follows: ——— provided, the party of the first part may, at its option, change the place of delivery of said water, so long as the same is near the highest point on the lands for which the water is delivered under and in accordance with the rules and regulations established from time to time by the party of the first part. Said water right is sold for the use of and to be appurtenant to the following described real estate now owned by the party of the second part, in the county of San Diego, state of California, to wit, ———, consisting of ——— acres. And it is expressly understood and agreed that the water right hereby sold shall belong to said described real estate, and be used thereon, and not diverted therefrom, or used on any other lands. In consideration of the foregoing stipulations and agreements, the party of the second part agrees and binds ———self, ——— heirs, executors, and assigns, to pay the sums above specified promptly as the same and each of them falls due, and that ——— will in all things comply with and perform the terms and conditions of this agreement on ——— part to be performed, and that ——— and they will promptly pay all annual water rates and charges for the water to which ——— is entitled under and by virtue of this agreement, at rates fixed by the party of the first part as allowed by law, and at the times, in the manner, and according to the rules and regulations made and adopted by the party of the first part; the annual rental for the amount of water to which the party of the second part is entitled under this contract to be paid whether the same is used or not; and also to pay for all water used by ——— on said land for domestic purposes at the rates fixed by the party of the first part, and allowed by law."

The answer alleges that under such contracts as that last quoted the company conveyed appurtenant water rights to about 200 acres of the lands to certain of the defendants.

The answer further alleges that the defendant J. M. Ballou owns a water right by virtue of a special written contract with the company, making such water right appurtenant to his land, and for a valuable consideration by him paid to said company, and under the following provisions:

"Provided, that said party of the second part shall make application in the form provided by the company for the use of the water, and use the same under the same restrictions and conditions, and to pay said party of the second part the current rate therefor as established for Chula Vista: provided, said restrictions and conditions are not inconsistent with the water right hereby granted to said party of the second part."

The answer further alleges that certain of the defendants, who are owners in the aggregate of 400 acres of what are known as the ex-Mission Lands, have annexed to them water rights by virtue of a written contract with the company, which reads as follows:

"The parties of the first part will make application for the use of the water upon the form provided by the party of the second part for that purpose, and pay for the use of the water at the current rates as may be enforced from time to time for supplying lands in National Ranch, and subject to the same general rules and regulations."

The answer further alleges that on or about June 3, 1895, the company established a classification of lands which had been or should be provided with water by its system, to take effect July 1, 1895, and afterward confirmed the same to take effect January 1, 1896, and that such classification has been adopted by the receiver, and is in words following, to wit:

"Tenth. For the purpose of fixing rates for irrigating acre property, the lands of that character are classified as follows: All lands to which the easement and flow of water for irrigation has been or shall be annexed by the consent or voluntary act of this company shall constitute the first class. All lands to which the easement and flow of water for irrigation has not been or shall not be annexed by the consent or voluntary act of this company shall constitute the second class."

And that in respect of such second class of lands the company, at the same times, promulgated the following, to wit:

"In addition to said annual rate for water used upon lands of said second class, there shall be paid upon the lands of said class an annual charge equal to six per centum of the value of the right to said easement and flow of water for irrigation, which said value shall be taken as one hundred ($100.00) dollars per acre."

The answer alleges that the lands of each and all of the defendants fall within the first class so defined by the company and the receiver.

The answer avers that neither of the defendants is, in any event, liable for more than his respective due proportion of the annual expenses of the repair, maintenance, and operation of the company's water system; that such of their number as have purchased lands with water rights appurtenant thereto from the company, and such of their number as have purchased water rights made appurtenant to their lands not bought of the company, have each and all paid the full amount demanded by the company as the price of the perpetual easement of the water supplied thereto by the company, and avers that such ease-

ments are, respectively, servitudes upon the company's water system, and have been fully paid for, and that the owners of such lands are forever discharged and acquitted from payment of any further sum or sums to apply on the principal of or as income upon the cost or value of the water company's system, or any debt incurred by the company for construction thereof. And the defendants "allege that said company, in each of said cases, received satisfaction for, from, and parted with to, each such defendant, or to his and her predecessor in interest, so much of its franchise to demand and collect water rentals proportioned to said lands as corresponded or related to interest or income on the cost. or value of said system, or to net annual receipts and profits thereof or therefrom; and that it retained and now holds only so much of its said franchise proportioned to said lands as relates to the due proportion of the annual reasonable expenses of the repair, management, and operation of such system; and that in said respects it has at all times put all other lands to which it has voluntarily annexed said water rights upon the same footing, and that all such lands have remained on the same footing for more than five years; that said lands have in many cases changed owners while so supplied with water at the same rates and on the same footing as to water rights with the land sold by the said company with annexed water rights as aforesaid; that the value of said water rights has for more than five years entered into the market value of said lands, and has in all cases been paid for to their vendors by the present owners, these defendants, who are successors in title by mesne or immediate conveyance of the lands to which, during the former ownership, the company voluntarily annexed said perpetual easement and water rights; and that neither any such lands nor the owners of any thereof are, in any event, liable for any other or further water rentals than are the lands the ownership of which with said water rights were derived from said corporation."

Copious extracts have thus been taken from the answer to show the grounds upon which it is strenuously contended the water in question must be continued to be furnished to the defendants for irrigation at.the annual rate of $3.50 per acre.

At the time of the adoption and taking effect of the constitution of California of 1879, the provisions of section 552 of the Civil Code of that state were, and yet are, as follows:

"Whenever any corporation, organized under the laws of this state, furnishes water to irrigate lands which said corporation has sold, the right to the flow and use of said water is and shall remain a perpetual easement to the land so sold, at such rates and terms as may be established by said corporation in pursuance of law. And whenever any person who is cultivating land on the line and within the flow of any ditch owned by such corporation, has been furnished water by it with which to irrigate his land, such person shall be entitled to the continued use of said water, upon the same terms as those who have purchased their land of the corporation."

Sections 1 and 2 of article 14 of the constitution of 1879 are as follows:

"Section 1. The use of all water now appropriated, or that may hereafter be appropriated, for sale, rental, or distribution, is hereby declared to be a public use, and subject to the regulation and control of the state, in the manner to

be prescribed by law: provided, that the rates or compensation to be collected by any person, company, or corporation in this state for the use of water supplied to any city and county, or city or town, or the inhabitants thereof, shall be fixed, annually, by the board of supervisors, or city and county, or city or town council, or other governing body of such city and county, or city or town, by ordinance or otherwise, in the manner that other ordinances or legislative acts or resolutions are passed by such body, and shall continue in force for one year, and no longer. Such ordinances or resolutions shall be passed in the month of February of each year, and take effect on the first day of July thereafter. Any board or body failing to pass the necessary ordinances or resolutions fixing water-rates, where necessary, within such time, shall be subject to peremptory process to compel action at the suit of any party interested, and shall be liable to such further processes and penalties as the legislature may prescribe. Any person, company, or corporation collecting water-rates in any city and county, or city or town in this state, otherwise than as so established, shall forfeit the franchises and water-works of such person, company, or corporation to the city and county, or city or town where the same are collected, for the public use.

"Sec. 2. The right to collect rates or compensation for the use of water supplied to any county, city and county, or town, or the inhabitants thereof, is a franchise, and cannot be exercised except by authority of and in the manner prescribed by law."

The late case of San Diego Land & Town Co. v. City of National City, decided by this court, and reported in 74 Fed. 79–86, presented the question, among others, whether that company had the legal right to demand and receive a sum of money, in addition to the annual rates it was authorized to charge, as a condition upon which it would furnish water appropriated by it under the constitution and laws of California, to the persons for whose use the appropriation was made. The thing for which that company demanded a sum of money, in addition to the annual rates it was by law authorized to charge, it designated as a "water right." In that case this court said:

"It does not change the essence of the thing for which the complainant demands a sum of money to call it a 'water right,' or to say, as it does, that the charge is imposed for the purpose of reimbursing complainant in part for the outlay to which it has been subjected. It is demanding a sum of money for doing what the constitution and laws of California authorized it to appropriate water within its limits, conferred upon it the great power of eminent domain, and the franchise to distribute and sell the water so appropriated, not only to those needing it for purposes of irrigation, but also to the cities and towns, and their inhabitants, within its flow; for which it was given the right to charge rates to be established by law, and nothing else. No authority can anywhere be found for any charge for the so-called 'water right.' The state permitted the water in question to be appropriated for distribution and sale for purposes of irrigation, and for domestic and other beneficial uses; conferring upon the appropriator the great powers mentioned, and compensating it for its outlay by the fixed annual rates. The complainant was not obliged to avail itself of the offer of the state, but, choosing, as it did, to accept the benefits conferred by the constitution and laws of California, it accepted them charged with the corresponding burden. Appropriating, as it did, the water in question for distribution and sale, it thereupon became, according to the express declaration of the constitution, charged with a public use. 'Whenever,' said the supreme court of California in McCrary v. Beaudry, 67 Cal. 120, 121, 7 Pac. 265, 'water is appropriated for distribution and sale, the public has a right to use it; that is, each member of the community, by paying the rate fixed for supplying it, has a right to use a reasonable quantity of it in a reasonable manner. Water appropriated for distribution and sale is ipso facto devoted to a public use, which is inconsistent with the right of the person so appropriating it to exercise the same control over it that he might have exercised if he had never so appropriated it.' "

In the present suit this ruling of this court is assailed, and it is said
for the company that it is opposed to the ruling of the supreme court
of California in the cases of Irrigation Co. v. Rowell, 80 Cal. 114, 22
Pac. 53, and Irrigation Co. v. Dunbar, 80 Cal. 530, 22 Pac. 275; that
in those two cases the supreme court of California expressly recog-
nized the existence of such a right, and enforced it in behalf of such
water companies. An examination of those cases clearly shows that
counsel is altogether mistaken in his statement. No such question
was there raised, considered, or decided. In neither of those cases
did it anywhere appear that the water, a part of which the Fresno
Canal Company undertook to sell in the one case, and to furnish in
the other, was appropriated by the company under or by virtue of the
constitution and laws of California; nor was it suggested in either
case that the water had otherwise become subject to the public use
declared by the constitution and laws of California, and for that rea-
son that only legally established rates could be charged for its use.
But a similar question did arise in the supreme court of Colorado in
the case of Wheeler v. Irrigating Co., 17 Pac. 487, and was there de-
cided in precise accord with the ruling of this court in San Diego
Land & Town Co. v. City of National City, supra. The provisions of
the constitution of Colorado were, at the time the case cited arose,
as follows (article 16):

"Sec. 5. The water of every natural stream not heretofore appropriated
within the state of Colorado is hereby declared to be the property of the pub-
lic, and the same is dedicated to the use of the people of the state, subject to
appropriation as hereinafter provided.

"Sec. 6. The right to divert unappropriated waters of any natural stream
to beneficial uses shall never be denied. Priority of appropriation shall give
the better right as between those using the water for the same purpose; but
when the waters of any natural stream are not sufficient for the service of
all those desiring the use of the same, those using the water for domestic
purposes shall have the preference over those claiming for any other purpose,
and those using the water for agricultural purposes shall have preference
over those using the same for manufacturing purposes.

"Sec. 7. All persons and corporations shall have the right of way across
public, private, and corporate lands for the construction of ditches, canals,
and flumes for the purpose of conveying water for domestic purposes, for
irrigation of agricultural lands, and for mining and manufacturing purposes,
and for drainage, upon payment of just compensation.

"Sec. 8. The general assembly shall provide by law that the board of county
commissioners in their respective counties shall have power, when applica-
tion is made to them by either party interested, to establish reasonable
maximum rates to be charged for the use of water, whether furnished by
individuals or corporations."

In the Colorado case the pleadings showed the water company to
be a carrier and distributer of water for irrigation and other purposes,
with a canal upwards of 60 miles in length, and capable of supplying
water to irrigate a large area of land. It had undisposed of a suffi-
cient quantity of water to supply the wants of the relator, who was
one of the landowners and consumers under the canal, and who could
obtain water from no other source. He tendered the amount of the
annual rental fixed by the company, and demanded the use of water
for the current season, but the company demanded as a condition
precedent to the granting of his request that he buy in advance "the

right to receive and use water" from its canal, and pay therefor $10 per acre,—just as the San Diego Land & Town Company, in the case decided by this court, demanded $50 per acre at one time and $100 per acre afterwards for a similar so-called "water right." The supreme court of Colorado held, as did this court in the case referred to, the demand, in addition to the annual rates, for the so-called "water right," illegal and void. In the course of his opinion, the justice delivering the opinion of the court said:

"Our constitution dedicates all unappropriated water in the natural streams of the state 'to the use of the people,' the ownership thereof being vested in 'the public.' The same instrument guaranties in the strongest terms the right of diversion and appropriation for beneficial uses. With certain qualifications, it recognizes and protects a prior right of user, acquired through priority of appropriation. We shall presently see that, after appropriation, the title to this water, save, perhaps, as to the limited quantity that may be actually flowing in the consumer's ditch or lateral, remains in the general public, while the paramount right to its use, unless forfeited, continues in the appropriator. But, to constitute a legal appropriation, the water diverted must be applied within a reasonable time to some beneficial use; that is to say, the diversion ripens into a valid appropriation only when the water is utilized by the consumer, though the priority of such appropriation may date, proper diligence having been used, from the commencement of the canal or ditch. The constitution unquestionably contemplates and sanctions the business of transporting water, for hire, from natural streams to distant consumers. The Colorado doctrines of ownership and appropriation (as declared in the constitution, statutes, and decisions) necessarily give the carrier of water an exceptional status; a status differing in some particulars from that of the ordinary common carrier. Certain peculiar rights are acquired in connection with the water diverted. It is unnecessary now, however, to enumerate these rights in detail. For the present it suffices to say that they are dependent for their birth and continued existence upon the use made by the consumer. But, giving these rights all due significance, I cannot consent to the proposition that the carrier becomes a 'proprietor' of the water diverted. A cursory reading of the statutes might convey the impression that the legislature regarded the carrier as possessing a salable interest in this water. And the constitutional phrase, 'to be charged for the use of water,' relating to the carrier's compensation, might, at first glance, seem to recognize a like ownership in such use. But, construing all the provisions of that instrument bearing upon the subject in pari materia, the correctness of both of these inferences must be denied. The constitutional convention was legislating with reference to the necessities and practical wants of the people; and this body, in its wisdom, ordained that the ownership of water should remain in the public, with a perpetual right to its use, free of charge, in the people. By section 8, art. 16, of the constitution, from which the foregoing phrase is taken, the convention recognized the carrier's right to compensation for transporting water, and provided for a judicial or quasi judicial tribunal to fix an equitable maximum charge where the parties fail to agree. It requires no citation of authority to show that the words 'purchase' and 'sale,' together with other words of like import, used in this connection by the legislature, must receive a corresponding interpretation. Under the constitution, as I understand it, the carrier is at least a quasi public servant or agent. It is not in the attitude of a private individual contracting for the sale or use of his private property. It exists largely for the benefit of others; being engaged in the business of transporting, for hire, water owned by the public, to the people owning the right to its use. It is permitted to acquire certain rights as against those subsequently diverting water from the same natural stream. It may exercise the power of eminent domain. Its business is affirmatively sanctioned, and its profits or emoluments are fairly guarantied. But in consideration of this express recognition, together with the privileges and protection thus given, it is, for the public good, charged with certain duties, and subjected to a reasonable control. Were the constitution and

statutes absolutely silent as to the amount of the charge for transportation, and the time and manner of its collection, there would be a strong legal ground for the position that the demand in these respects must be reasonable. The carrier voluntarily engages in the enterprise. It has in most instances, from the nature of things, a monopoly of the business along the line of its canal. Its vocation, together with the use of its property, are closely allied to the public interest. Its conduct in connection therewith materially affects the community at large. It is, I think, charged with what the decisions term a 'public duty or trust.' "

In the subsequent case of Combs v. Ditch Co., 28 Pac. 968, the supreme court of Colorado held that the constitutional right of individual consumers, upon tender of the regular rates, to water diverted by a carrier, cannot be evaded or qualified by a regulation compelling the purchase of stock in the carrier company as a condition precedent to its use; saying:

"If ditch companies were at liberty to divert water without limit, and at the same time make the ownership of stock an absolute condition precedent to the right to procure water from their irrigating canals, water rights would soon become a matter of speculation and monopoly, and tillers of the soil would have to pay exorbitant rates for the use of water, or our arid lands would become unproductive. The constitution provides that the water of natural streams may be diverted to beneficial use; but the privilege of diversion is granted only for uses truly beneficial, and not for purposes of speculation. This is evident from the fact that provision is made for establishing reasonable rates to be charged for the use of water by individuals or corporations furnishing the same, the evident purpose of which is that actual and beneficial consumers of water may not be subjected to extortionate demands."

In line with what has been said above are the cases in the supreme court of California of Price v. Irrigating Co., 56 Cal. 431, and People v. Stephens, 62 Cal. 209. In Price v. Irrigating Co. it was, among other things, claimed that the company was a purely private corporation, and was not obliged to furnish water to the public. The court said:

"So far as the appropriation, purchase, or condemnation as to a public use of waters for irrigation purposes, as also their distribution for rates or tolls, is concerned, defendant cannot deny that it is a 'canal' company. Each person entitled to water, on the theory that such companies are charged with the duty of disposing of it for proper compensation, is entitled to treat with defendant as if it had been organized exclusively under the act of May 14, 1862, 'An act to authorize the incorporation of canal companies and the construction of canals' (St. 1862, p. 540). The rights and privileges which may be claimed and exercised by defendant with respect to water are derived from that act. With reference to such rights and privileges, and their corresponding obligations, the defendant is at least a corporation de facto. It cannot successfully assert the one and disregard the other. Every corporation deriving its being from the act above cited has impressed upon it a public trust,—the duty of furnishing water, if water it has, to all those who come within the class or community for whose alleged benefit it has been created. Every such corporation may exercise, on behalf of the public, the power of eminent domain; and no man, nor company of men, incorporated or otherwise, can take the property of a citizen for his own or their own exclusive benefit. So plain a proposition cannot require elaboration. The power —in its nature a public power—and the public duty are correlative. The duty exists without any express statutory words imposing it wherever the public use appears. Nor is it necessary, as the case is presented, to deny that a corporation may be formed to furnish with water, for purposes of irrigation, a particular community, or even a particular territory, provided the territory is not in the exclusive occupation of the corporation itself. This defendant was organized 'to furnish, sell, give, or supply water to any person or corporation, for irrigation, mechanical, or other purposes.' Even assuming that the duty

imposed on defendant by its articles of incorporation, and the law under which it was created, could be limited by a transfer to it from the Southern California Colony Association of its 'rights, franchises, and privileges,' the last-named corporation was organized to furnish, etc., water to people of the town and colony mentioned in the complaint, 'and others' in the townships specifically set forth, for irrigation and other purposes. The plaintiff's land is a portion of one of the townships named in the complaint and the articles of incorporation of the Southern California Colony Association. The defendant, therefore, is bound to furnish plaintiff with water to irrigate his lands on his payment of the rates fixed in the manner prescribed by law,—it having the water to furnish. The case shows that defendant has an ample supply of water to furnish the quantity demanded by those entitled to receive it, including the quantity alleged on argument to be needed by plaintiff. The rates which defendant may charge have never been fixed in the manner required by law, but defendant has itself fixed the rates, and could not be permitted to refuse water to one otherwise entitled to receive it who should offer to pay those rates."

In People v. Stephens, in speaking of sections 1 and 2 of article 14 of the constitution of California, the court said:

"By section 1 of article 14, the use of all water heretofore or hereafter appropriated for sale, rental, or distribution is expressly declared to be a public use. It is not left to the legislature, as formerly, to say whether it shall be a public use or not, but the constitution itself declares it to be such, and then makes the use subject to the regulation and control of the state,—that is to say, of the legislature,—in the manner to be prescribed by law, to wit, by statute law, subject, however, to certain enumerated provisions contained in the constitution itself; among them, to provisions in respect to the rates or compensation to be collected by any person, company, or corporation for the use of water supplied to any city and county, or city or town, or the inhabitants thereof. Such rates or compensation the constitution expressly declares shall be fixed in a certain specified manner, at a certain time, and by a certain body; and the body failing to do so is expressly made 'subject to peremptory process to compel action, at the suit of any party interested, and liable to such further processes and penalties as the legislature may prescribe.' But by the next section of the same article of the constitution the right to collect the rates or compensation so established is declared to be a franchise, 'and cannot be exercised except by authority and in the manner prescribed by law'; that is, by statute law. But, of course, the constitution contemplated the enacting by the legislature, where they did not exist, of all laws necessary to give effect to its commands, and that none should be passed in contravention of its provisions. When, therefore, the constitution fixed the manner of establishing the rates or compensation to be charged for water furnished to any city and county, or city or town, or the inhabitants thereof, and further declared that the right to collect the rates or compensation so established is a franchise, and cannot be exercised except by authority of and in the manner prescribed by law. it was the duty of the legislature, if they did not exist, to provide the needful laws."

It is impossible to reconcile the declarations of the supreme court of California in either of the two cases last referred to, or in any other case to which my attention has been called, with a right on the part of any corporation appropriating water under and by virtue of the constitution and laws of California for sale, rental, or distribution, to exact any sum of money or other thing, in addition to the legally established rates, as a condition upon which it will furnish to consumers water so appropriated. In the very late case of Merrill v. Irrigation Co., 44 Pac. 720, the supreme court of California held that the provisions of section 1 of article 14 of the constitution of that state apply to all water designed, set apart, and devoted to purposes of sale, rental, or distribution, without reference to the mode

of its acquisition; and accordingly it held in that case that water acquired by the irrigation company from the city of Los Angeles was subject to the constitutional provisions referred to, and that the company, having supplied it for irrigation to the plaintiff in that case, was, by virtue of the second clause of section 552 of the Civil Code of California, legally bound to continue such supply at the rates it had established; the company having on hand a sufficient supply for the purpose. Of course, no company can be compelled to furnish water beyond its capacity. Indeed, consumers themselves are vitally interested in seeing that the capacity of the distributer is not overtaxed; so much so that in Colorado it is held, and properly held, that a consumer who settles upon and improves land by means of water appropriated and distributed under and by virtue of the constitution and laws of that state, giving to, the first in time the first in right, can maintain a suit against the distributer of such water to prevent the spreading of it beyond the capacity of the system, so as to endanger the supply of those whose rights have already vested, and upon the faith of which they have invested their money and made their improvements. Wyatt v. Irrigation Co. (Colo. Sup.) 33 Pac. 144. In California the same right is secured to the consumer by statute, as well as by judicial decision. It has already been seen from the reference made to the case of Price v. Irrigating Co., 56 Cal. 431, and Merrill v. Irrigation Co. (Cal.) 44 Pac. 720, that the right of the consumer to demand of the corporation a supply of water presupposes a sufficient supply for the purpose under the control of the company; and by the provisions of section 552 of the Civil Code of California a consumer whose rights have once vested is protected from the injury of having his supply of water cut off, for it in terms declares him entitled to the continued use of the water upon the payment of the rates established as required by law. Necessarily growing out of this right to the continued use of the water which he has acquired as a perpetual easement to his land, is the right of such consumer to prevent, by injunction, if need be, the distributer from disposing of or attempting to furnish others beyond the capacity of the system, thereby imperiling the rights of those already vested. So long, however, as a sufficient supply exists, every person within the flow of the system has the legal right to the use of a reasonable amount of the water in a reasonable manner upon paying the rate fixed for supplying it. In California, as has been seen, the constitution itself provides that the rates or compensation to be collected by any person, company, or corporation for the use of water supplied to any city, town, or other municipality shall be fixed in the month of February of each year by the governing body of such city, town, or other municipality, "by ordinance or otherwise, in the manner that other ordinances or legislative acts or resolutions are passed by such body, and shall continue in force for one year, and no longer." The rates to be charged for water appropriated under and by virtue of the constitution and laws of the state to persons outside of cities, towns, and other municipalities were, by the constitution, left to be provided for by the legislature. And this the legislature of California did by an act approved March 12, 1885 (St.

1885, p. 95), entitled "An act to regulate and control the sale, rental, and distribution of appropriated water in the state other than in any city, city and county, or town therein, and to secure the rights of way for the conveyance of such water to the places of use." By the terms of this act of the legislature, the boards of supervisors of the several counties are given power, and it is made their duty, in the manner prescribed in the act, to fix the maximum rates at which any person, company, or corporation may sell, rent, or distribute water appropriated for the purpose. The circumstances and conditions under which such board is authorized and required to do that thing are prescribed by sections 3, 4, 5, and 6, of the act. The action of the board can only be invoked in the first instance by a petition in writing of not less than 25 of the inhabitants, who are taxpayers of the county. It may be that the number thus fixed by the statute is too large; that in some cases it may be difficult, in others impossible, to obtain 25 inhabitants, who are taxpayers of the county, to join in the petition asking the board to establish maximum rates. If so, it is a matter for the consideration of the legislature, with which the constitution has left it. By the statute, as enacted, when such a petition, so signed, has been presented, the board, upon giving the notice required, is empowered to examine witnesses; to send for persons, books, and accounts; to ascertain the value of the water system, and the reasonable expenses of its management and operation, including the cost of repairs, together with all other facts, circumstances, and conditions pertinent to the question, and, after such investigation and consideration, to fix and establish the maximum rates at which the water shall be sold, rented, or distributed to the inhabitants of the county outside of any city, town, or other municipality; the board being empowered to establish different rates for water furnished for the different uses, such as mining, irrigation, mechanical, manufacturing, and domestic, but being required to make them equal and uniform as to each class, and being further required to "so adjust them that the net annual receipts and profits thereof to the said persons, associations, and corporations so furnishing such water to such inhabitants shall be not less than six nor more than eighteen per cent. upon the said value of the canals, ditches, flumes, chutes, and all other property actually used and useful to the appropriation and furnishing of such water, of each of such persons, companies, associations, and corporations; but in estimating such net receipts and profits, the costs of any extensions, enlargement, or other permanent improvements of such water rights or waterworks shall not be included as part of the said expenses of management, repair, and operating of such works, but when accomplished may and shall be included in the present cost and cash value of such work." By section 6 of the act it is provided that at any time after the rates have been once established by the board of supervisors the same may be established anew or abrogated in whole or in part by such board, to take effect one year next after such first establishment, upon either the written petition of 25 of the inhabitants who are taxpayers of the county, or "upon the written petition of any persons, companies, associations, or corporations the rates

and compensations of whose appropriated waters have already been fixed and regulated and are still subject to such regulation by any of the boards of supervisors of this state, as in this act provided." Not until after the rates have been once established upon the petition of 25 of the inhabitants who are taxpayers of the county is the person, company, or corporation furnishing the water authorized to make any application to the board. Then, and then only, such person, company, or corporation may apply to have the rates established anew, or abrogated in whole or in part.

Since, to make good the appropriation, it is essential that the water be applied to some beneficial use, these provisions of the statute of themselves necessarily presuppose that, until the action of the board of supervisors is called into play, the parties furnishing the water must designate the rates. It cannot be furnished for nothing. The law does not exact that, nor has any consumer the right to expect it. The statute evidently proceeds upon the theory that the rates charged by the person, company, or corporation may be satisfactory to the consumers; in which event there would be no occasion for the intervention of the board of supervisors. But, to protect the consumers in the event such charges should be unsatisfactory, they, and they only, are given the right to first invoke the intervention and action of the board. Until that time, the rates established and collected by the person, company, or corporation furnishing the water prevail. This, it seems to me, would be the true and obvious construction of the statute if it had not so declared in terms. But the statute itself does so declare in terms, and in these words:

"Until such rates shall be so established (namely, those first established by the board), or after they shall have been abrogated by such board of supervisors as in this act provided, the actual rates established and collected by each of the persons, companies, associations, and corporations now furnishing or that shall hereafter furnish appropriated waters for such rental or distribution to the inhabitants of any of the counties of this state shall be deemed and accepted as the legal rates thereof." Act Cal. March 12, 1885, § 5.

Should the rates fixed by the board designated by the law for the purpose be so unreasonable as to justify the interposition of a court, any party aggrieved would have his remedy in the appropriate court, by which such unreasonable rates would be annulled, and the question again remitted to the body designated by the law to establish them. But in no case would the court undertake to do so. Reagan v. Trust Co., 154 U. S. 420, 14 Sup. Ct. 1062; Railway Co. v. Wellman, 143 U. S. 339, 12 Sup. Ct. 400; Santa Ana Water Co. v. Town of San Buenaventura, 65 Fed. 323. Therefore it is not for the court in the present case to go into the question of the reasonableness of the rates established by the complainant, and which it seeks to enforce. If unreasonable, and the consumers are for that reason dissatisfied therewith, resort must first be had to the body designated by the law to fix proper rates, to wit, the board of supervisors of San Diego county.

The suggestion urged by the defendants that the board of supervisors cannot be trusted, but will be controlled by the water company, even if based on fact, is no argument whatever against the existence

and validity of the law. But it cannot be true, unless the people themselves, having the selection of such officers, deliberately choose to put in such positions of honor and trust unworthy and debased men.

The views above expressed are conclusive against the positions of the defendants, unless it be, as claimed by them, that the complainant is estopped from making any changes in the rates at which it has heretofore furnished the defendants with water, or that the water in question is so far private property as that the parties to the suit could make valid contracts in respect to the rates at which the company should furnish it to the defendants. If the company is a private corporation, and the water private property, this would undoubtedly be so; but if the complainant is a public or quasi public corporation, and the water in question is, and at all the times mentioned has been, charged with a public use, it is not true; for nothing can be clearer than that, in respect to such water, rates established in pursuance of law must control, and that no attempt to ignore that control and to establish them by private contract is of any validity. The fact that some of the purposes for which the complainant company was incorporated are purely private is unimportant, since among the purposes is "the supplying of water to the public," and "the construction and maintenance of dams and canals for the purpose of waterworks, irrigation, or manufacturing." As said by the supreme court of California in Price v. Irrigating Co., supra, the complainant company cannot escape the performance of the duty of furnishing the public with water by asserting that it was also incorporated for some private purpose or purposes. Both the bill and answer assert the public character of the complainant, as well as the fact that the water in question was appropriated by the complainant under and by virtue of the constitution and laws of California for sale, rental, and distribution to the public. In the bill it is alleged "that the said company is, and has been, during said times, the owner of valuable water, water rights, reservoirs, and an entire water system, for furnishing water to consumers for domestic, irrigation, and other purposes, for which water is needed for consumption, and of a franchise for the impounding, sale, disposition, and distribution of the waters owned and stored by it to the defendants and other consumers, and to the city of National City and its inhabitants." And again, "That by the expenditure of said large sum said company has procured and owns, subject to the public use and the regulation thereof by law, water, water rights, a reservoir site and reservoirs, * * * and has constructed and laid therefrom its water mains necessary to supply the defendants and their lands hereinafter mentioned, and the city of National City and its inhabitants, with water, and has constructed and put in mains, pipes, and all other things necessary to connect said water supply with the premises and buildings of the defendants, and each of them, and to all the buildings and premises of said city and its inhabitants, and to furnish them and each of them with water; and was, at the times hereinafter mentioned, furnishing them, and each of them, with water." The defendants, in their answer, "deny that said corporation is, or at any time was, the owner of the water or

water rights, as alleged in the complaint, otherwise than as the appropriator, under the constitution and statutes of the state of California and the acts of congress, of the water of the natural stream in the said county of San Diego known as the 'Sweetwater River'; and they aver that the purposes of such appropriation were for sale, rental, and distribution to the public." In view of these statements in the pleadings of the parties themselves, it is too plain for discussion that the water in question is charged with the public use declared by the constitution and laws of California. Under such circumstances, the case of McFadden v. Board of Sup'rs, 74 Cal. 571, 16 Pac. 397, relied upon by the defendants, has no application whatever. Nor is the case one, in my opinion, for the operation of any doctrine of estoppel. Indeed, one of the counsel for the defendants says in his brief:

"It is not our claim that the company is estopped to change the rate by reason of the fact that it has established and collected a lower rate, but we claim that, in so far as the company is engaged in furnishing water for a public use, it has no right to make rates at all, either in the first instance or by way of changing them after they have once been adopted; that, in so far as the use is private, when the right arises out of a contract or deed, the rate fixed by the contract controls, and the rights vested by the deed at the time it is made cannot be changed by one party to it. Neither do we claim that by any contract between the parties with reference to the rates to be charged for the use of water where it is being distributed to the public, the power of regulation, which the constitution declares should belong to the state, can be taken away. What we say is that, as to those rates which are vested, as it were, as private rights, the company has no legal right to establish another rate than that agreed upon; that, in so far as the rate is to a public use, the statute has said that that which has been fixed and established by the mutual consent of the parties or by their action, which amounts to consent, those rates shall not displace the power of the government to regulate, but shall themselves be the rates until the sovereign power of regulation is exercised."

As the water in question, from the moment the appropriation became effective, became charged with a public use, it was not in the power of either the corporation making the appropriation or of the consumers to make any contract or representation that would at all take away or abridge the power of the state to fix and regulate the rates. All persons are presumed to know the law, and those who bought lands from the complainant corporation upon its representations that water for irrigation would be furnished at the annual rate of $3.50 an acre, or otherwise acted or contracted with reference to such rates, must be held to have known that the constitution conferred upon the legislature the power, and made it its duty, to prescribe the manner in which such rates should be established. This the legislature has done by the act of March 12, 1885. As by that act the legislature deemed it proper to allow the action of the board of supervisors to be invoked in the first instance only by 25 inhabitants, who are taxpayers, of the county, and until then to leave the designation of rates to the person, company, or corporation furnishing the water, to hold valid and binding any contract between parties with reference thereto would be, in effect, to ignore and set aside the provisions of the statute upon the subject; for it is plain that a contract must bind all of the parties to it, or it binds none; and, if binding at all, its manifest effect would be to remove from the regulation of the

state the rates in question, and leave them to be governed and controlled by private contract, or such representations and acts as may amount to the same thing. No company or corporation charged with a public use can be estopped by any act or representation from performing the duties enjoined on it by law. It will hardly be contended that the defendants, by reason of any of the express contracts pleaded in defense of the suit, or of any contract growing out of the representations alleged to have been made by the company, would be estopped from applying to the board of supervisors of the county for the establishment of rates. The case, in truth, affords no basis for the operation of an estoppel against either party; which, to be good, must be mutual. Litchfield v. Goodnow's Adm'r, 123 U. S. 549, 8 Sup. Ct. 210.

The complainant, being in charge of a public use, in the management of it, does not act for the defendants alone, but, to the extent of the capacity of the system to furnish water, for all of the public who are or may be situated within its reach; all of whom similarly situated, and for like purposes, are entitled to similar rates. Exceptions sustained.