SAN DIEGO LAND & TOWN CO. v. CITY OF NATIONAL CITY et al.

(Circuit Court, S. D. California.    May 4, 1896.)

No. 648.

1. WATER RIGHTS AND WATER COMPANIES — FOREIGN CORPORATIONS — CONSTITUTIONAL LAW—ESTOPPEL.

A foreign corporation, coming into California, and acquiring water and water rights under the provisions of the state constitution (Const. 1879. art. 14, § 1), which declares that the use of water appropriated for sale, rent, or distribution is a public use, subject to regulation and control by the state, and that the rates of compensation for such use shall be fixed annually by cities, counties, and towns, will not be heard to assert that the constitution and laws under which it has acquired such rights are in contravention of the constitution of the United States.    Such corporation may, however, question the reasonableness of the rates established by any municipality.

2. SAME — JUDICIAL POWER — REASONABLENESS OF CHARGES — MUNICIPAL CORPORATIONS.

It is within the scope of judicial power, and a part of judicial duty, to inquire whether rates of compensation fixed by municipalities and corporations for the use of appropriated water in California operate to deprive the owner of his property without just compensation; and, if the court finds from the evidence that they are manifestly unreasonable, it is its duty to annul them.

3. SAME—RATE—BASIS FOR DETERMINATION.

Where a municipality undertakes to reduce the rates for the use of appropriated water, and the plant supplying the same, the basis upon which reasonable and just rates are to be determined is the present value of the plant, and not its original cost; having due regard to the cost of maintenance, depreciation by wear and tear, and the rights of the public.    If, on that basis, a fair interest is allowed, there can be no just cause of complaint.

4. SAME—SEPARATE CHARGE FOR WATER RIGHT.

A company which has appropriated the waters of a stream for purposes of sale and distribution, under the constitution and laws of California, has no right, before furnishing new applicants with water, to make, in addition to the regular charges established pursuant to law, a separate charge, of a gross sum, for the so-called "water right." On the contrary, each member of the community has the right, on paying the rate fixed, to use a reasonable quantity of water in a reasonable manner.

5. SAME—REASONABLENESS OF RATES.

In determining what are reasonable rates for supplying water to the inhabitants of a town which includes but a part of the territory supplied by a water company through one general system, the charges should be fixed with a view to yielding a fair rate of interest on the value of that part of the plant referable to the territory embraced in the town, without attempting to make compensation for losses sustained in the distribution of

water to consumers outside the town. Nor is it material that, for the purpose of completing its plant. the company borrowed money, and issued bonds on which it is paying interest.

Works & Works, for plaintiff.
Gibson & Titus, for defendants.

ROSS, Circuit Judge.    The municipality known as "The City of National City" having, through its board of trustees, established by ordinance the rates at which the complainant corporation should furnish the city and its inhabitants with water for domestic purposes and purposes of irrigation, for the year commencing July 1, 1895, and ending July 1, 1896, the complainant commenced this suit for the purpose of obtaining a decree of this court adjudging that the provisions of the constitution and laws of the state of California pursuant to which the proceedings by the board of trustees of the defendant corporation fixing the rates were had, be declared to be in violation of the fourteenth amendment to the constitution of the United States, and that the rates so established be, on that ground, annulled, or, in the event the court shall determine that the provisions of the constitution and laws of the state of California do not contravene the constitution of the United States, then that the rates fixed by the board of trustees of the defendant corporation be decreed to be arbitrary, unreasonable, and unjust, and for that reason void, and their enforcement enjoined, and that the board of trustees be ordered and required to adopt a new and reasonable rate of charge, and that it be decreed that the complainant corporation is entitled to charge and collect for "water rights," at reasonable rates, as a condition upon which it will furnish water to the inhabitants of the municipality for the purposes of irrigation, independent of the rates fixed by the board of trustees for water sold and furnished by the company.

The complainant is a corporation organized and existing under and by virtue of the laws of the state of Kansas, for the purpose of acquiring property rights and transacting business in the state of California, subject, of course, to the constitution and laws of that state, one provision of whose constitution is that "no corporation organized outside the limits of the state shall be allowed to transact business within this state on more favorable conditions than are prescribed by law to similar corporations organized under the laws of this state."    Const. Cal. art. 12, § 15.    The provisions of the constitution and laws of California which the complainant seeks to avoid as being in contravention of the constitution of the United States are the provisions of section 1 of article 14 of the constitution of 1879, and provisions enacted by the legislature of the state pursuant thereto.    The constitutional provision is as follows:

"The use of all water now appropriated, or that may hereafter be appropriated, for sale, rental, or distribution. is hereby declared to be a public use, and subject to the regulation and control of the state, in the manner to be prescribed by law;  provided, that the rates or compensation to be collected by any person, company, or corporation in this state for the use of water supplied to any city and county, or city or town, or the inhabitants thereof, shall be fixed, annually, by the board of supervisors, or city and county,

or city or town council, or other governing body of such city and county, or city or town, by ordinance or otherwise, in the manner that other ordinances or legislative acts or resolutions are passed by such body, and shall continue in force for one year, and no longer. Such ordinances or resolutions shall be passed in the month of February of each year, and take effect on the first day of July thereafter. Any board or body failing to pass the necessary ordinances or resolutions fixing water-rates, where necessary, within such time, shall be subject to peremptory process to compel action at the suit of any party interested, and shall be liable to such further processes and penalties as the legislature may prescribe. Any person, company, or corporation collecting water-rates in any city and county, or city or town in this state, otherwise than as so established, shall forfeit the franchises and water-works of such person, company, or corporation to the city and county, or city or town, where the same are collected, for the public use."

In Spring Valley Waterworks v. City of San Francisco, 82 Cal. 286, 22 Pac. 910, 1046, the supreme court of California held that this provision of the constitution of the state did not contemplate or require notice to be given to persons or corporations to be affected by the fixing of the water rates to be charged by them. Whether that provision of the constitution of California, as thus construed by the highest court of the state, would deny to a person or corporation supplying the people of a municipality with water acquired prior to the adoption of the provision the protection secured by the constitution of the United States, need not be decided or considered. In the present case the complainant came into the state of California, and acquired the water and water rights which form the basis of its suit under and by virtue of laws passed pursuant to that provision of the constitution of the state which it now seeks to assail as being contrary to the provisions of the constitution of the United States. To permit the complainant to do this would, in effect, be to permit it to rely upon the constitution and laws of California as a valid basis for the acquisition of its asserted rights, and at the same time to treat as void the same provisions, where they impose a burden in connection with those rights. The complainant cannot be permitted to thus blow hot and cold in the same breath. If it was not willing to subject itself to the burden imposed by the constitution and laws of California upon all persons and corporations appropriating water in the state for distribution and sale, it should not have come, as it did, into the state, and availed itself of the rights of appropriation conferred by the same constitution and laws. Taking those benefits, it assumed the corresponding burden, and will not be heard to assert the one and repudiate the other. This view does not, however, preclude the complainant from questioning the reasonableness of the rates established by the municipal authorities, for the power to regulate and fix is not the power to take without just compensation. To compel the complainant to supply the people of the municipality with water acquired by it without just compensation would manifestly be nothing short of confiscation. To what extent municipal authorities may go in that direction, without reaching the prohibited point, has never yet been definitely fixed by judicial decision, but that the power has a limit has been decided. Thus, in Reagan v. Trust Co., 154 U. S. 362–399, 14 Sup. Ct. 1047, the supreme court said:

v.74F.no.1—6

"It is within the scope of judicial power, and a part of judicial duty, to restrain anything which, in the form of a regulation of rates, operates to deny to the owners of property invested in the business of transportation that equal protection which is the constitutional right of all owners of other property. There is nothing new or strange in this. It has always been a part of the judicial function to determine whether the act of one party (whether that party be a single individual, an organized body, or the public as a whole) operates to divest the other party of any rights of person or property. In every constitution is the guaranty against the taking of private property for public use without just compensation. The equal protection of the laws which, by the fourteenth amendment, no state can deny to the individual, forbids legislation, in whatever form it may be enacted, by which the property of one individual is, without compensation, wrested from him for the benefit of another or of the public. This, as has been often observed, is a government of law, and not a government of men; and it must never be forgotten that under such a government, with its constitutional limitations and guaranties, the forms of law and the machinery of government, with all their reach and power, must, in their actual workings, stop on the hither side of the unnecessary and uncompensated taking or destruction of any private property, legally acquired and legally held."

In the same case the court said that:

"It is unnecessary to decide, and we do not wish to be understood as laying down as an absolute rule, that in every case a failure to produce some profit to those who have invested their money in the building of a road is conclusive that the tariff is unjust and unreasonable. And yet justice demands that every one should receive some compensation for the use of his money or property, if it be possible without prejudice to the rights of others."

In the subsequent case of Ames v. Railway Co., 64 Fed. 165, 177, Mr. Justice Brewer, sitting in the circuit court, and having under consideration an act of the legislature of Nebraska prescribing the maximum rates for transportation of freight by railroads within that state, said:

"What is the test by which the reasonableness of rates is determined? This is not yet fully settled. Indeed, it is doubtful whether any single rule can be laid down, applicable to all cases. If it be said that the rates must be such as to secure to the owners a reasonable per cent. on the money invested, it will be remembered that many things have happened to make the investment far in excess of the actual value of the property,—injudicious contracts, poor engineering, unusually high cost of material, rascality on the part of those engaged in the construction or management of the property. These and many other things, as is well known, are factors which have largely entered into the investments with which many railroad properties stand charged. Now, if the public was seeking to take title to the railroad by condemnation, the present value of the property, and not the cost, is that which [it] would have to pay. In like manner, it may be argued that, when the legislature assumes the right to reduce, the rates so reduced cannot be adjudged unreasonable if under them there is earned by the railroad company a fair interest on the actual value of the property."

In Spring Valley Waterworks v. City of San Francisco, supra, the supreme court of California, in speaking of the provision of the constitution of that state here in question, held that, in order to justify the court in setting aside the rates fixed by a municipal corporation, "there must be actual fraud in fixing the rates, or they must be so palpably and grossly unreasonable and unjust as to amount to the same thing." 82 Cal. 306, 22 Pac. 910, 1046. To the latter rule,— that is to say, that there must be actual fraud, or its equivalent, on the part of the municipal authorities, in order to justify a court in

adjudging the rates established by them unreasonable,—I cannot yield assent. The same court, in the same case, in construing the constitutional provision, said:

"When the constitution provides for the fixing of rates or compensation, it means reasonable rates and just compensation. To fix such rates and compensation is the duty, and within the jurisdiction, of the board. To fix rates not reasonable, or compensation not just, is a plain violation of its duty."

In the case of Spring Valley Waterworks v. Schottler, 110 U. S. 347, 4 Sup. Ct. 48, Chief Justice Waite, in speaking of the same constitutional provision, said:

"By the constitution, and the legislation under it, the municipal authorities have been created a special tribunal to determine what, as between the public and the company, shall be deemed a reasonable price during a certain limited period. Like every other tribunal established by the legislature for such a purpose, their duties are judicial in their nature, and they are bound, in morals and in law, to exercise an honest judgment as to all matters submitted for their official determination."

The court further observed that it was not necessary, in that case, to determine "what may be done if the municipal authorities do not exercise an honest judgment, or if they fix upon a price which is manifestly unreasonable."

It is obvious, I think, that it must be held, either that the right of judicial interference exists only when the schedule of rates established will fail to secure the owners of the property *some* compensation or income from their investment (however small), or else that the court must adjudicate, when properly called upon to do so, whether the rates established by the municipal authorities are so manifestly unreasonable as to amount to the taking of property for public use without just compensation. Undoubtedly, every intendment is in favor of the rates as established by the municipal authorities. But as it is firmly established that it is within the scope of judicial power, and a part of judicial duty, to inquire whether rates so established operate to deprive the owner of his property without just compensation, it seems to me that it logically follows that, if the court finds from the evidence produced that they are manifestly unreasonable, it is its duty so to adjudge, and to annul them; for it is plain that if they are manifestly unreasonable they cannot be just. In the solution of that problem many considerations may enter; among them, the amount of money actually invested. But that is by no means, of itself, controlling, even where the property was at the time fairly worth what it cost. If it has since enhanced in value, those who invested their money in it, like others who invest their money in any other kind of property, are justly entitled to the benefit of the increased value. If, on the other hand, the property has decreased in value, it is but right that those who invested their money in it, and took the chances of an increase in value, should bear the burden of the decrease. In my judgment, it is the actual value of the property at the time the rates are to be fixed that should form the basis upon which to compute just rates; having, at the same time, due regard to the rights of the public, and to the cost of maintenance of the plant, and its depreciation by reason of wear and tear. If one has property to sell, it is its present value that is looked to, one element

of which may very properly be its cost; but one element only. So, too, if one has property to lease, it is its present value, rather than its cost, upon which the amount of rent is based. And if, as said by Mr. Justice Brewer in Ames v. Railway Co., supra, the public were seeking to condemn the property in question for a greater public use, if that be possible, its present value, and not its cost, is that which the public would have to pay. It follows, I think, that, where the public undertakes to reduce the rates to be charged for the use of such property, it is its present value, and not its cost, that must be taken as a basis upon which to fix reasonable and just rates; having due regard to the cost of its maintenance, to its depreciation by reason of wear and tear, and also to the rights of the public. If, upon such a basis, a fair interest is allowed, no just cause of complaint can exist.

In the present case, the evidence shows that the chief object of the organization of the complainant company was the acquiring of land, and the subdividing and selling of it for profit. In pursuance of that purpose, the complainant did acquire large tracts in San Diego county, Cal., in what is known as the "Sweetwater Valley," in Chula Vista, and in National City, all within the boundaries of the National rancho, and in Otay Valley, adjacent to that rancho on the south, and in the territory known as the "Ex-Mission Lands," adjacent to National City on the north, aggregating many thousands of acres. Almost all of the lands were dry, and, in their natural condition, were of but little value. Principally for the purpose of adding to their value, and of enabling the company to sell them to advantage, the complainant, in the years 1886 and 1887, appropriated, under and by virtue of the constitution and laws of California, the waters of the stream known as the "Sweetwater River," and, for the purpose of impounding those waters, in order that it might distribute and sell them in connection with its lands, and likewise distribute and sell them to other landowners and individuals within their flow for purposes of irrigation, and domestic and other beneficial uses, proceeded to construct across the bed of the stream a huge dam, known as the "Sweetwater Dam." Connecting therewith, the complainant constructed a system of main and lateral pipes, called "Pipe System No. 1," from which it commenced to serve consumers of water in February, 1888. As constructed, pipe system No. 1 covered a large territory, much the larger portion of which was owned by the company. Its Chula Vista tract, consisting of about 5,000 acres, it laid out and platted into blocks of 40 acres each, and subdivided those blocks into lots of 5 acres each, to each of which its pipes were extended. National City embraces about 3,375 acres of land, of which about 833 acres are laid out into 6,691 town lots, of which the complainant, in January, 1887, owned 2,849, and of the remaining acreage the complainant then owned 685 acres. When the city ordinance here complained of was enacted, the complainant still owned 2,671 city lots, and owned about the same acreage within the city. The total population of National City was then about 1,300, and the aggregate number of acres then under irrigation within the city limits was about 747. The complainant's main and lateral pipes were

laid in the streets of the city by virtue of a franchise granted by its authorities pursuant to the provisions of section 2 of article 14 of the constitution of the state, which declares:

"The right to collect rates or compensation for the use of water supplied to any county, city and county or town, or the inhabitants thereof, is a franchise, and cannot be exercised except by authority of and in the form prescribed by law."

And the pipes were so laid as to reach the lots and farming lands of the company within the city, as well as the lots and farming lands of others therein, and were extended through the city to supply a portion of the lands to the north, a part of which were owned by the company, and a part by third persons. The pipes of the company's system No. 1 were also so laid as to supply water to the lands and its inhabitants adjoining National City on the south, much of which land was owned by the company, and much of it by other persons. As the territory covered by the pipe system was then—and, indeed, yet is—very sparsely settled, it is manifest that it was laid for the purpose of attracting the purchase and settlement of the lands, and in anticipation of a future demand for the water, and was far in advance of the then demand for it. Naturally and necessarily, in carrying into execution those objects, a great deal of money was expended by the complainant. The testimony on its behalf is that in acquiring its water and reservoir site, and putting in its dam and system of pipes necessary to supply consumers thereunder with water, it actually expended $1,022,473.54. While these figures are contested by the defendants, I do not find any satisfactory evidence that the cost at the time was excessive. The work was undertaken and performed during what is known in Southern California as the "Boom of 1886–7," and at a time when material and labor of all kinds were very high. Defective pipe, it is true, to the amount of $57,666.53, was used, most of which had to be subsequently removed; but that was a latent defect, not readily discoverable, and which was not discovered by the complainant's engineer until after the pipe had been laid, and put to the practical test of conducting the water. Shortly before the adoption of the city ordinance here complained of, the complainant commenced, and, subsequent to the adoption of the ordinance, completed, another system of pipes, called "Pipe System No. 2," at a cost of about $65,000. This system was constructed to relieve the pressure upon system No. 1, and thereby to increase its efficiency, and to supply lands not reached by that system. From at least as early as the completion of its pipe system No. 1, the complainant, by public advertisement and otherwise, offered and held its farming and orchard lands and its lots in National City for sale, representing the water of its system to be piped to and over its lands and lots, and up to December 18, 1892, represented that an abundance of water would be supplied to purchasers of such lands, for their irrigation, at the rate of $3.50 per acre per annum, and for city lots in ample quantity and at cheap rates. Under those representations, the complainant sold a large number of acres of farming and orchard lands in separate tracts, and widely scattered, to all of which purchasers it furnished water

for purposes of irrigation at the rate of $3.50 per acre per annum. And it also furnished water for purposes of irrigation to various other persons whose lands are within its flow, at the same rate, of $3.50 per acre per annum. But commencing with December 18, 1892, and extending to February, 1895, the complainant demanded of all consumers of water, other than those to whom it had furnished water for irrigation prior to that date, the sum of $50 per acre, where water is required for purposes of irrigation, in addition to the annual charge; for what it denominated a "water right"; and thereafter it demanded, and still demands, $100 per acre, in addition to the annual charge, for a so-called "water right" for irrigation purposes, from all persons other than those to whom it had furnished water for those purposes prior to December 18, 1892. One of the objects of the present suit is to obtain a decree establishing the validity of that claim of the complainant to exact a sum of money, in addition to an annual charge, as a condition on which alone the complainant will furnish consumers of water for irrigation purposes, other than those to whom it had furnished it for such purposes prior to December 18, 1892. And the contest that arose between the consumers and the company over this charge for a so-called "water right," and the refusal of the municipal authorities of National City to allow that charge in respect to acreage property within the city limits, is one of the principal causes of the present suit. It does not change the essence of the thing for which the complainant demands a sum of money to call it a "water right," or to say, as it does, that the charge is imposed for the purpose of reimbursing complainant in part for the outlay to which it has been subjected. It is demanding a sum of money for doing what the constitution and laws of California authorized it to appropriate water within its limits, conferred upon it the great power of eminent domain, and the franchise to distribute and sell the water so appropriated, not only to those needing it for purposes of irrigation, but also to the cities and towns, and their inhabitants, within its flow, for which it was given the right to charge rates to be established by law, and nothing else. No authority can anywhere be found for any charge for the so-called "water right." The state permitted the water in question to be appropriated for distribution and sale for purposes of irrigation, and for domestic and other beneficial uses; conferring upon the appropriator the great powers mentioned, and compensating it for its outlay by the fixed annual rates. The complainant was not obliged to avail itself of the offer of the state, but, choosing, as it did, to accept the benefits conferred by the constitution and laws of California, it accepted them charged with the corresponding burden. Appropriating, as it did, the water in question for distribution and sale, it thereupon became, according to the express declaration of the constitution, charged with a public use. "Whenever," said the supreme court of California in McCrary v. Beaudry, 67 Cal. 120, 121, 7 Pac. 264, "water is appropriated for distribution and sale, the public has a right to use it; that is, each member of the community, by paying the rate fixed for supplying it, has a right to use a reasonable quantity of it in a reasonable manner. Water appropriated for distribu-

tion and sale is ipso facto devoted to a public use, which is inconsistent with the right of the person so appropriating it to exercise the same control over it that he might have exercised if he had never so appropriated it." To the same effect is People v. Stephens, 62 Cal. 209; Price v. Irrigating Co., 56 Cal. 431.

Nor can the complainant justly insist that the rates fixed by the municipal authorities of National City for water furnished the city and its inhabitants should be so adjusted as to in any way compensate it for losses, if any, sustained by it in the distribution of water to consumers outside of the city. It is quite evident from the record that the maintenance of so extensive a water system for the supply with water of such a sparsely-settled territory, taken as a whole, and considering the value of the property, and the depreciation by wear and tear of the plant, does not yield the complainant very much above expenses, although it appears from the statements of the accounts of the water department, reported to the company by its president, that the net income to the company from that department for the year 1894 was $7,850.18; for the year 1893, $13,160.58; for the year 1892, $7,547.93; and for the year 1891, $4,449.27. But, for such profits, be they small or great, or even for losses thus incurred, the consumers of water within National City are not responsible. Such losses, if any such have been sustained, must be borne by the complainant as best it can, like all other companies and individuals who embark in undertakings whose realization does not come up to their expectations and hopes. Had the complainant succeeded in selling, or in procuring the settlement upon and cultivation of, all or a large portion of its lands and lots, and thus have secured a larger number of consumers of its water, no doubt its investment, as a whole, would have proved fairly remunerative, and may, it is to be hoped, yet do so. But if, as I think the evidence shows, the rates established by the ordinance complained of, to wit, City Ordinance No. 118 of the defendant corporation, will yield a fair interest on that portion of the value of the property properly referable to the territory embraced within National City, making due allowance for the cost of its maintenance, and the depreciation of the plant by reason of its wear and tear, it follows that the complainant has no just cause of complaint. The evidence shows that the rates so established by Ordinance 118 will yield quite as much as, and, indeed, a little more than, the preceding ordinance (No. 112) establishing rates for the preceding year, and that the rates established by that ordinance were practically the same as those established by Ordinance No. 107, the next preceding one, and that the rates established by that ordinance were satisfactory to the complainant company, except that it did not allow the company pay for the so-called "water right." That claim on the part of the company appears to be, in the language of one of the witnesses, "the bone of contention" between the company, on the one side, and the consumers and city authorities, on the other. That it is without any valid basis to rest upon I think very clear for the reasons already stated.

Nor can it make any difference that the complainant, in the construction of its plant and the carrying on of its work, borrowed

$300,000, on which it pays interest, and for which, it may be, it issued its bonds. The buyer of such bonds, like the loaner of money on a mortgage upon real estate, does so with his eyes open. The loaner of money on a mortgage knows that conditions may be such as to increase the value of his security, or they may be such as to decrease its value. He takes the chances that everybody must take who engages in business transactions. The buyer of bonds issued by a water company such as the complainant has the like knowledge, and the further knowledge that the law, which every one is presumed to know, prescribes that the rates to be charged for the water furnished by the company shall be established and fixed by a special tribunal, subject, as all state laws are, to the paramount provisions of the constitution of the United States, among which is one which secures such investors against the fixing of such rates as will operate to deprive him of his property without just compensation. It results from the views above expressed that the bill must be dismissed at complainant's cost. It is so ordered.