SAN DIEGO LAND & TOWN CO. v. JASPER et al.

(Circuit Court, S. D. California. August 26, 1901.)

No. 768.

1. PARTIES—REGULATION OF WATER RATES—SUITS TO TEST VALIDITY OF ORDINANCE.
     A suit by a company furnishing water, appropriated under the laws of California, to consumers, for irrigation and other purposes, to test the validity of rates fixed by a board of supervisors as required by statute, is properly brought against the board, which, as representing the public generally in the matter, is authorized to defend in behalf of all parties interested.

2. WATER—REGULATION OF RATES—CALIFORNIA STATUTE.
     Under Act Cal. March 12, 1885, requiring boards of supervisors, on petition of 25 inhabitants who are taxpayers of the county, to fix maximum rates at which any person, company, or corporation may sell, rent, or distribute water appropriated for the purpose under the laws of the state, the validity of an ordinance fixing such rates is not affected by the fact that the petitioners were not consumers of water from the company furnishing the same, nor that they were procured to sign the petition by consumers who did not desire to become petitioners, because of the possible effect such action might have on their rights in pending litigation with the company.

3. SAME—REASONABLENESS OF RATES.
     In exercising the power delegated by the statute of California to boards of supervisors to fix maximum rates of compensation to be charged to consumers for water appropriated for sale under the laws of the state, the question of the reasonableness of the rates fixed is primarily one for the determination of the boards, and the courts are not authorized to interfere with the enforcement of rates so established unless they are so plainly and palpably unreasonable as to make their enforcement equivalent to the taking of private property for public use without just compensation.

4. SAME—BASIS FOR FIXING RATES—VALUE OF PLANT.
     Act Cal. March 12, 1885, makes it the duty of boards of supervisors, on petition, to fix maximum rates which may be charged to consumers for water by persons or companies appropriating the same. It provides that the boards "shall estimate, as nearly as may be, the value of the canals, ditches, flumes, water chutes, and all other property actually used and useful to the appropriation and furnishing of such water," belonging to the person or corporation whose franchise shall be so regulated and controlled, and their annual reasonable expenses, and for

that purpose may require the attendance of witnesses and the production of books and accounts; that in fixing such rates they shall, as near as may be, so adjust them that the net annual receipts and profits of the persons or companies so furnishing water shall not be less than 6 nor more than 18 per cent. "upon the said value of the canals, ditches, flumes, chutes and all other property actually used and useful to the appropriation of such water." It also provides for a readjustment of the rates fixed, on petition, to take effect at any time after one year. *Held*, that such act does not make the cost of the plant used in appropriating and furnishing water the test of its value for the purpose of fixing rates, but requires such rates to be based upon its actual value at the time, as determined by the board, notwithstanding a further provision that the cost of extensions, enlargements, and other permanent improvements shall not be included as a part of operating expenses, "but when accomplished may and shall be included in the present cost and value of such work."

5. SAME—DETERIORATION OF PLANT.

The fact that a board, in fixing rates under such statute, made no allowance for the deterioration of the plant, does not authorize a court to declare the rates fixed unreasonable, although such fact of deterioration should properly be taken into consideration, since the court can consider only the final result of the board's action as embodied in the ordinance, and not the processes by which such result was reached.

In Equity. Suit to enjoin the enforcement of rates established by the board of supervisors of San Diego county, Cal., to be charged by complainant for water furnished to consumers for irrigation and other domestic purposes.

For former opinion, see 89 Fed. 274.

Works & Lee and Works & Works, for complainant.

A. H. Sweet, T. L. Lewis, and A. Haines, for defendants.

ROSS, Circuit Judge. The complainant is a corporation of the state of Maine, having succeeded to the rights of a Kansas corporation of the same name in and to the property described in the bill, the object of which is to obtain a decree annulling certain water rates established by the board of supervisors of San Diego county. To a clear understanding of the case, it is necessary to refer to certain prior suits, in which the predecessor in interest of the present complainant was involved, one of which was a suit brought against the city of National City to set aside a certain ordinance fixing the rates at which the San Diego Land & Town Company should furnish that city and its inhabitants with water for domestic purposes and purposes of irrigation. San Diego Land & Town Co. v. City of National City (C. C.) 74 Fed. 79. It was there shown—what is partly shown in the present record—that the chief object of the land and town company was the acquiring of land, and the subdividing and selling of it for profit. In pursuance of that purpose the complainant did acquire large tracts in San Diego county in what is known as the "Sweetwater Valley," in Chula Vista, and in National City, all within the boundaries of the National Rancho, and in the Otay Valley, adjacent to that rancho on the south, and in the territory known as the "Ex-Mission Lands," adjacent to National City on the north, aggregating many thousands of acres. Almost all of the lands were dry, and in their natural condition were of but little value.

Principally for the purpose of adding to their value and of enabling the company to sell them to advantage, the complainant in the years 1886 and 1887 appropriated, under and by virtue of the constitution and laws of California, the waters of the stream known as the "Sweetwater River," and, for the purpose of impounding those waters, in order that it might distribute and sell them in connection with its lands, and likewise distribute and sell them to other landowners and individuals within their flow, for purposes of irrigation and domestic and other beneficial uses, proceeded to construct across the bed of the stream a large dam known as the "Sweetwater Dam." Connecting therewith the complainant constructed a system of main and lateral pipes, called "Pipe System No. 1," from which it commenced to serve the consumers of water in February, 1888. As constructed, pipe system No. 1 covered a large territory, much the larger portion of which was owned by the company. Its Chula Vista tract, consisting of about 5,000 acres, it laid out and platted in blocks of 40 acres each, and subdivided those blocks in lots of 5 acres each, to each of which its pipes were extended. National City embraces about 3,375 acres of land, of which about 833 are laid out into 6,691 town lots, of which the complainant in January, 1887, owned 2,849, and of the remaining acreage the complainant then owned 685 acres. When the city ordinance involved in the case of San Diego Land & Town Co. v. City of National City was enacted, the complainant still owned 2,671 city lots, and owned about the same acreage within the city. The total population of National City was then about 1,300, and the aggregate number of acres then under irrigation within the city limits was about 747. The complainant's main and lateral pipes were laid in the streets of the city by virtue of a franchise granted by its authorities pursuant to the provisions of section 2 of article 14 of the constitution of the state of California, which declares:

"The right to collect rates or compensation for the use of waters supplied to any county, city and county, or town, or the inhabitants thereof, is a franchise, and cannot be exercised except by authority of and in the manner prescribed by law."

The pipes were so laid as to reach the lots and farming lands of the company within the city, as well as the lots and farming lands of others therein, and were extended through the city to supply a portion of the lands to the north, a part of which were owned by the company and a part by third persons. The pipes of the company's system No. 1 were also so laid as to supply water to the land and its inhabitants adjoining National City on the south, much of which land was owned by the company, and much of it by other persons. As the territory covered by the pipe system was then, and indeed yet is, very sparsely settled, it is manifest that it was laid for the purpose of attracting the purchase and settlement of the lands, and in anticipation of a future demand for the water, and was far in advance of the then demand for it. Naturally and necessarily in carrying into execution those objects a great deal of money was expended by the company. The testimony on behalf of the complainant in the National City Case was, and the testimony on behalf of the complainant in the present suit is, to the effect that in acquiring the water and

reservoir system, and in putting in the dam and system of pipes necessary to supply consumers thereunder with water, the company actually expended $1,022,473.54. The company subsequently constructed another system of pipes, called "Pipe System No. 2," at a cost of about $65,000, for the purpose of relieving the pressure upon its system No. 1, and thereby to increase its efficiency, and to supply lands not reached by that system. From at least as early as the completion of its pipe system No. 1 the original company, by public advertisement and otherwise, offered and held its farming and orchard lands and its lots in National City for sale, representing the water of its system to be piped to and over its lands and lots, and up to December 18, 1892, represented that an abundance of water would be supplied to purchasers of such lands for their irrigation at the rate of $3.50 per acre per annum, and for city lots in ample quantity and at cheap rates. Under those representations it sold a large number of acres of farming and orchard lands in separate tracts and widely scattered, to all of which purchasers it furnished water for purposes of irrigation at the rate of $3.50 per acre per annum. And it also furnished water for purposes of irrigation to various other persons whose lands are within its flow at the same rate of $3.50 per acre per annum. But commencing with December 18, 1892, and extending to February, 1895, the company demanded of all consumers of water, other than those to whom it had furnished water for irrigation prior to that date, the sum of $50 per acre, where water is required for purposes of irrigation, in addition to the annual charge, for what it denominated a "water right"; and thereafter it demanded $100 per acre, in addition to the annual charge, for a so-called "water right" for irrigation purposes from all persons other than those to whom it had furnished water for those purposes prior to December 18, 1892. One of the objects of the suit against National City was the establishment of the validity of the claim of the company to exact a sum of money in addition to an annual charge as a condition on which alone the company would furnish consumers with water for irrigation purposes other than those to whom it had furnished it for such purposes prior to December 18, 1892; and the contest that arose between the consumers and the company over that charge, and the refusal of the municipal authorities of National City to allow the charge in respect to acreage property within the city limits, was one of the principal causes of that suit. This court decided against the validity of the exaction for the so-called "water right," and also held that the rates established by the city council were not so low as to justify the court in interfering with them on the ground that they amounted to the taking of the company's property without just compensation. On appeal to the supreme court the judgment here given was affirmed; the supreme court, however, not finding it necessary to determine the question as to the validity of the exaction for the so-called water right. 174 U. S. 739, 19 Sup. Ct. 804, 43 L. Ed. 1154. Some time after the bringing of the suit of San Diego Land & Town Co. v. City of National City, the property of that company passed into the hands of a receiver, who during the course of the adminis-

110 F.—45

tration of his trust raised the rates at which water had theretofore been furnished to the consumers for irrigation purposes from $3.50 to $7 per acre per annum; and that action on his part gave rise to the litigation involved in the suit of Lanning v. Osborne, brought in and decided by this court, and reported in 76 Fed. 319. In that case the validity of the exaction of money for the alleged water right as a condition precedent to the furnishing of water by the company for the purposes of irrigation was again considered, and decided by this court as before; and there was also involved and determined by this court the question as to whether the company was estopped from changing the rate, and the further question of power on the part of the company to fix a reasonable charge for the furnishing of such water in the absence of any action under the act of the legislature of the state of California approved March 12, 1885, entitled "An act to regulate and control the sale, rental, and distribution of appropriated water in this state, other than in any city, city and county, or town therein, and to secure the rights of way for the conveyance of such water to the places of use." St. 1885, p. 95. That decision of this court was also under review by the supreme court on an appeal from its judgment dismissing a bill filed for the review of the decision, and resulted in the affirmance of the judgment here given; the supreme court, however, again finding it unnecessary to decide the question as to the validity of the exaction for the so-called water right. Osborne v. San Diego Land & Town Co., 178 U. S. 22, 20 Sup. Ct. 860, 44 L. Ed. 961. A similar ruling was made by this court in respect to the so-called water right in the cases of Mandell v. San Diego Land & Town Co., 89 Fed. 295, and Souther et al. v. San Diego Flume Co., not reported. On appeal from the judgment of this court in the last-mentioned case the circuit court of appeals for this circuit reversed the judgment, and held valid a contract exacting $9,000 as a condition precedent to the right of a consumer to use water that had been appropriated, under and pursuant to the provisions of the constitution of California of 1879, and of the statutes of the state passed in pursuance thereof, for sale, rental, and distribution, in addition to the legally established rates for its use. Flume Co. v. Souther, 32 C. C. A. 548, 90 Fed. 164. But the court of appeals subsequently granted a rehearing of the case, which was pending at the time the supreme court of California decided the case of Irrigation Co. v. Park, 129 Cal. 437, 62 Pac. 87, after which the circuit court of appeals again decided the appeal in the case of Flume Co. v. Souther, and reaffirmed its former ruling, saying in its opinion (44 C. C. A. 143, 104 Fed. 706), among other things, that the question had been set at rest by the decision of the supreme court of California in the case of Irrigation Co. v. Park. Although that case seems to be generally regarded as sustaining the validity of such exactions for the right to use water appropriated under the provisions of the constitution of California of 1879, and of the statutes of the state passed in pursuance thereof, a reference to the case as reported fails to show that any such point was involved. The facts upon which the decision was based are set out in the opinion of the court, at page 439, 129 Cal., and page 87, 62 Pac., as follows:

"The respondent is a corporation organized in February, 1871, for the purpose of straightening, improving, etc., the natural channel of Kings river and its branches, and taking water therefrom by means of canals and ditches for various beneficial uses, and, among others, for the disposition of the waters, and 'collecting annual rents and charges therefor.' On March 28, 1892, respondent and one E. B. Perrin executed a written instrument, which was duly acknowledged by the parties, and was recorded on the 31st of the same month. Plaintiff's canals and ditches run through an agricultural region, and do not furnish water within any city, town, or municipality. The covenants of this instrument necessary to be mentioned here are as follows: The respondent, in consideration of a certain sum of money then paid it by Perrin, covenanted to furnish to the latter from its main canal, or from a branch thereof, all the water that may be required for the irrigation of a described piece of land then owned by him for a certain number of years, commencing May 28, 1892, 'not exceeding at any time one cubic foot per second.' The respondent agreed to put a suitable gate in the bank of the canal at the most convenient point for the conveyance of water to Perrin's land, and Perrin agreed to construct a ditch from the gate to his land at his own cost, etc. Perrin agreed that he would not use the water, or permit it to be used, on any land other than that described in the instrument, and would not permit it to run to waste, and would provide means to carry any surplus water back to the respondent's canal. It was declared that the water to be thus furnished was intended to be an appurtenance to and to run with the land, that the right thereto was to be transferable only with the land, and that respondent was to be bound by the instrument only to subsequent owners of the land. Perrin covenanted for himself, his heirs, assigns, and successors in interest, for the payment annually to respondent of the sum of one hundred dollars on the 1st day of September of each of the years mentioned. It was agreed, also, that respondent might make a number of similar contracts with other persons, and that, if at any time the aggregate quantity of water should be insufficient to supply all the contractors, Perrin and each of the others should receive his proportionate share. It was declared that the covenants of Perrin should run with and 'bind the land.'"

It will be readily seen from the facts thus stated that there was nothing to show that the appropriation of the water there in question was made under and by virtue of the provisions of the constitution of California of 1879. On the contrary, the implication is strong, from the fact that the respondent corporation in that case was organized in February, 1871, for the purpose of appropriating water from Kings river for sale, that the appropriation was made long prior to the adoption of the constitution of California of 1879. And that the court must have understood such to have been the fact would seem to appear from its reference to the well-known history of the state,— that from its foundation the waters pertaining to the public lands of both the federal and state governments have been appropriated, used, and sold for mining, agricultural, and other useful purposes, which appropriation and use were from the beginning encouraged, recognized, and sanctioned by the legislature of the state, by its supreme court in numerous cases, and subsequently by the legislation of congress and by the decisions of the supreme court of the United States. All of this was abundantly shown in my dissenting opinion in the case of Lux v. Haggin, 69 Cal. 442, 10 Pac. 674. In none of the cases decided by this court to which reference has been made was it ever doubted that the appropriators of water upon the public lands under that condition of the law possessed the right to sell or otherwise dispose of such appropriated water upon any terms and condi-

tions that might be agreed upon; but the question with which this court was called upon to deal in the cases referred to involved appropriations made under and pursuant to the provisions of the constitution of California of 1879, which presented a very different question, and which, as it seems to me, does not appear to have been the case involved in Irrigation Co. v. Park, 129 Cal. 437, 62 Pac. 87. It is true that in that case the supreme court of the state does discuss the provisions of the constitution of 1879, and of the legislative acts adopted in pursuance thereof, and does hold that they do not take away the right of a furnisher of water for irrigation purposes to collect rates or compensation fixed by contract, in the absence of statutory provisions prescribing the rates to be charged therefor. It should be remembered, however, that the contract there involved was one by which the parties agreed upon an annual charge of $100 for the use of the water, which, so far as appeared, had been appropriated long prior to the adoption of the constitution of California of 1879. It did not appear in that case that the appropriator exacted any sum of money or other thing as a condition precedent to the right to use the water, in addition to the rates to be lawfully fixed for its use, and least of all that it exacted any money or other thing as a condition precedent to the right to use water appropriated under the provisions of the constitution of the state of 1879, which declares water appropriated under its provisions (article 14, § 1) to be "charged with a public use." But the decision of the supreme court of the state in the case of Irrigation Co. v. Park was treated by the circuit court of appeals in the decision of the case of Flume Co. v. Souther, as appears from its opinion reported in 44 C. C. A. 143, 104 Fed. 706, as having construed the constitution of California of 1879 and the state statutes passed in pursuance thereof as declaring that an appropriator of water under and pursuant to their provisions, for sale, rental, or distribution, has the right to exact a sum of money or other thing, in addition to the legally established rates, as a condition upon which he will furnish to consumers water so appropriated; and by that decision of the circuit court of appeals this court is, of course, bound. In California, as has already been shown, the constitution (article 14, § 1) itself provides that the rates or compensation to be collected by any person, company, or corporation for the use of water supplied to any city, town, or municipality shall be fixed in the month of February of each year by the action of the governing body of such city, town or other municipality, "by ordinance or otherwise, in the manner that other ordinances or legislative acts or resolutions are passed by such body, and shall continue in force for one year and no longer." The rates to be charged for water appropriated under and by virtue of the constitution and laws of the state to persons outside of such cities, towns, and other municipalities were, by the constitution, left to be provided for by the legislature; and this the legislature of California did by the act above referred to, approved March 12, 1885. By the terms of that act the boards of supervisors of the several counties of the state are given power, and it is made their duty, in the manner prescribed in the act, to fix the maximum rates at which any person, company, or corporation may sell, rent,

or distribute water appropriated for the purpose. The circumstances and conditions under which such boards are authorized and required to do that thing are prescribed by sections 3, 4, 5, and 6 of the act. The action of the board can only be invoked in the first instance by a petition in writing of not less than 25 inhabitants who are taxpayers of the county. When such a petition, so signed, has been presented, the board, upon giving the notice required, is, by the statute, empowered to hear the petition. What it is thereafter authorized and required to do may be best seen by inserting sections 4 and 5 of the act, which are as follows:

"Sec. 4. At the hearing of said petition the board of supervisors shall estimate, as near as may be, the value of the canals, ditches, flumes, water chutes, and all other property actually used and useful to the appropriation and furnishing of such water, belonging to and possessed by each person, association, company, or corporation, whose franchise shall be so regulated and controlled; and shall in like manner estimate as to each of such persons, companies, associations, and corporations, their annual reasonable expenses, including the cost of repairs, management, and operating such works; and, for the purpose of such ascertainment, may require the attendance of persons to give evidence, and the production of papers, books, and accounts, and may compel the attendance of such persons and the production of papers, books. and accounts, by attachments, if within their respective counties.

"Sec. 5. In the regulation and control of such water rates for each of such persons, companies, associations, and corporations, such board of supervisors may establish different rates at which water may and shall be sold, rented, or distributed, as the case may be; and may also establish different rates and compensation for such water so to be furnished for the several different uses, such as mining, irrigating, mechanical, manufacturing, and domestic, for which such water shall be supplied to such inhabitants, but such rates as to each class shall be equal and uniform. Said boards of supervisors, in fixing such rates, shall, as near as may be, so adjust them that the net annual receipts and profits thereof to the said persons, companies, associations, and corporations so furnishing such water to such inhabitants shall be not less than six nor more than eighteen per cent. upon the said value of the canals, ditches, flumes, chutes, and all other property actually used and useful to the appropriation and furnishing of such water of each of such persons, companies, associations, and corporations; but in estimating such net receipts and profits, the cost of any extensions, enlargements, or other permanent improvements of such water rights or waterworks shall not be included as part of the said expenses of management, repairs, and operating of such works, but when accomplished, may and shall be included in the present cost and cash value of such work. In fixing said rates, within the limits aforesaid, at which water shall be so furnished as to each of such persons, companies, associations, and corporations, each of said board of supervisors may likewise take into estimation any and all other facts, circumstances, and conditions pertinent thereto, to the end and purpose that said rates shall be equal, reasonable, and just, both to such persons, companies, associations, and corporations, and to said inhabitants. The said rates, when so fixed by such board, shall be binding and conclusive for not less than one year next after their establishment, and until established anew or abrogated by such board of supervisors, as hereinafter provided. And until such rates shall be so established, or after they shall have been abrogated by such board of supervisors, as in this act provided, the actual rates established and collected by each of the persons, companies, associations, and corporations now furnishing, or that shall hereafter furnish, appropriated waters for sale, rental, or distribution to the inhabitants of any of the counties of this state, shall be deemed and accepted as the legally established rates thereof."

By section 6 of the act it is provided that at any time after the rates have been once established by the board of supervisors the same may be established anew or abrogated in whole or in part by such board, to take effect one year next after such first establishment, upon either the written petition of 25 of the inhabitants who are taxpayers of the county, or "upon the written petition of any persons, companies, associations, or corporations, the rates and compensation of whose appropriated waters have already been fixed and regulated and are still subject to such regulation by any of the boards of supervisors of this state as in this act provided."

After the views of this court in respect to a money exaction for the so-called water right, and in respect to the alleged estoppel, and in respect to the construction of the provisions of the act of the legislature of California of March 12, 1885, had been expressed in the case of Lanning v. Osborne, 76 Fed. 319, upon exceptions filed by the defendants to the bill in that case, and before that suit had been finally disposed of either by the supreme court or by this court, certain of the consumers of water under the company's system, and who were defendants in the suit, procured 25 inhabitants of the county of San Diego, who were not consumers of water from the company's system at all, to institute proceedings before the board of supervisors of that county, under and by virtue of the provisions of the act of California of March 12, 1885, to have the rates to be charged by the company established by the board. This was after the present complainant had succeeded to the rights of the Kansas corporation of the same name. To the proceedings thus initiated before the board of supervisors, the consumers, by their attorneys, who were also consumers of water under the company's system, appeared and filed the following document:

"To the Honorable Board of Supervisors of the County of San Diego: The present consumers of water for irrigation from the system of the San Diego Land and Town Company, who live outside of the city of National City, hereby allege and claim that each of them, respectively, has by purchase or otherwise become the owner of a right to the flow and use of so much of the water appropriated by said company for sale, rental, and distribution as is necessary to irrigate his or her respective tract of land under said company's system; that to each of said tracts of land the said company or its predecessor in title did, by its consent and voluntary act, annex the easement of the right to the flow and use of water from said system for irrigation of such tract in freehold; that each such consumer has fully paid or otherwise satisfied said company and its predecessor for the full price and value of such water right; and that none of said consumers, nor any of the lands of such consumers, are liable to pay to said company any water rate other than their due proportion of the annual reasonable expenses of such company, to cover the cost of repairs, management, and operation of the works used and useful to the appropriation and furnishing of such water to such land. And each and all said consumers protest against the fixing of any rates, as to them, to provide or create net annual receipts and profits upon the value of said company's water system so used, and useful for the appropriation and furnishing of such water to their respective lands.

"Haines & Ward and C. H. Rippey,
"Attorneys for the Consumers."

Much evidence was given before the board of supervisors by and on behalf of the respective parties to the proceeding. Among other

things, it was shown on behalf of the company what the original cost of the plant was; the percentage of depreciation; the annual expenses of repairs, management, and operation, and the cost of extensions and enlargements and other permanent improvements of the works; and on the part of the protestants it was, among other things, shown that the entire plant was for the year in question assessed upon the county assessment roll of the county at $155,000, and further that the present complainant acquired the entire property of the Kansas corporation, including its lands, for $889,163.33. The rate fixed by the board of supervisors for the water for irrigation purposes was $3.50 per acre per annum, which rate the complainant seeks by the present bill to have annulled on the ground that it is so low as to amount to the taking of its property without just compensation, contrary to the provisions of the constitution of the United States. To the bill the defendants filed exceptions and also demurrers, all of which were overruled by the court, with leave to the defendants to answer. The 25 defendants who initiated by petition the proceedings before the supervisors resulting in the fixing of the rates sought by the bill to be annulled did not answer the bill, and default was entered against them soon after the time for their appearance expired. The members of the board of supervisors alone made answer to the bill, putting in issue many of its material averments, and alleging, among other things, that the complainant's plant was not worth to exceed $250,000. On the trial of the issues thereby made in this case, evidence was also given on behalf of the complainant as to the cost of the water system, the percentage of the depreciation of the plant, the annual expenses for repairs, management, and operation, and as to the costs of the permanent improvements thereto; and evidence was also given on behalf of the defendants tending to show that the plant cost very much more than it was fairly worth, and that it could be replaced for less than two-thirds of its original cost. At the conclusion of the evidence given before the board of supervisors the complainant filed with the board the following request:

"That in the fixing and determination of the rates to be charged by this company for water to be furnished to its consumers the board find and determine the following matters, to wit: (1) The value of the dam, reservoir, water rights, and distributing system, and all other property actually needed by said company, and useful to the appropriation and furnishing of such water. (2) The annual reasonable expenses of the company, including the cost of repairs, management, and operating its works. (3) The cost of any extensions, enlargements, or other permanent improvements of the waterworks of the company since the original construction of its plant. (4) The amount of depreciation of the plant of the company by natural wear from use and the action of the elements, either by way of percentage per annum of such deterioration, or the gross sum thereof for the years since the company commenced to furnish water. (5) The rates for irrigation necessary to be charged, together with the domestic rates, in order to return to the company net annual receipts and profits of not less than six per cent. upon the value of its property as found by the board."

The board refused to make or file the findings so requested, but it appears from the testimony of the only one of its members who was examined as a witness on this hearing that the supervisors pre-

·pare'd and signed the following paper, a copy of which each of them retained, but which was never placed among its records:

"Office of the Board of Supervisors of the County of San Diego, State of California.

"In the Matter of Fixing Water Rates for the San Diego Land and Town Co. of Maine. Findings.

"This matter coming on regularly to be heard, and the evidence all being presented, the board, after a careful consideration of all the testimony regarding the value of the water plant of the San Diego Land and Town Company of Maine, including the amount at which the entire property had recently been sold, to wit, $889,163.33, and the proportionate value of the said plant to the whole of the property sold, and the amount at which said plant has been carried upon the assessment rolls of the county for the past eight years, to wit, $155,000.00— We estimate and determine the value of said plant to be $350,000.00. We further fix the rate of interest at 6 per cent. per annum, making the sum of $21,000.00 per annum. We further estimate and determine the amount of the expense necessary to maintain and operate said plant to be $13,442.00. Making the sum total of revenue to be raised for the company $34,442.00 per annum. We further estimate and determine the capacity of the reservoir to be 3,000,000,000 gallons. We further estimate and determine that the amount of water used by National City to be about 600,000,000 gallons per annum. We further estimate the amount of water available for outside irrigation purposes to be 2,400,000,000 gallons,—a sufficient quantity to irrigate 6,080 acres of land, allowing 350,000 gallons per acre: and we fix an annual rate of $3.50 per acre, making a sum total of $21,280.00 per annum. We further find that the annual sum the company receives from the sale of water to National City is $13,162.00, which sum, taken together with the above-estimated amount of outside water rental ($21,280.00), makes a total of $34,442.00, the whole amount required to produce the interest and operating expenses as above set forth."

It appears from the evidence that at the time the ordinance in question was adopted, which was in the month of October, the water supply of the complainant, by reason of the drought that had then for a long time prevailed in Southern California, was only about one-third of the normal supply, and, the drought having unfortunately continued, that the supply rapidly decreased, until within about a year it was entirely exhausted.

Three points are made on behalf of the complainant: First, that the petitioners who initiated the proceedings before the board of supervisors are, in contemplation of law, the only parties in interest, and therefore that upon the entry of the default against them for failure to answer the bill herein the complainant became entitled to a decree setting aside the rates, and declaring the ordinance fixing them void; second, that the ordinance should be declared invalid because procured in such a way as to amount to a deception upon the board of supervisors, in that it was procured to be prosecuted by interested parties in the name of parties having no interest in the fixing of the rates; and, third, that the rates established by the ordinance complained of are so unreasonably low as to amount to the taking of the complainant's property without just compensation, contrary to the provisions of the constitution of the United States.

The answer to the first point is that each and every person to whom the rates fixed apply—in other words, the public—is interested in the question, and the representative of this public in the matter is the board of supervisors, each member of which was by the complain-

ant made a party defendant to the suit, and all of whom appeared to the bill and interposed a defense in behalf of all parties interested. This practice has been uniformly sanctioned and held to be proper. Railway Co. v. Minnesota, 134 U. S. 418, 10 Sup. Ct. 462, 702, 33 L. Ed. 970; Reagan v. Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014; Railroad Co. v. Smith, 128 U. S. 174, 9 Sup. Ct. 47, 32 L. Ed. 377; Stone v. Railroad Co., 116 U. S. 353, 6 Sup. Ct. 349, 29 L. Ed. 651; Railway Co. v. Gill, 156 U. S. 649, 15 Sup. Ct. 484, 39 L. Ed. 567; San Diego Land & Town Co. v. City of National City (C. C.) 74 Fed. 79; Id., 174 U. S. 739, 19 Sup. Ct. 804, 43 L. Ed. 1154; Peik v. Railway Co., 94 U. S. 164, 24 L. Ed. 97.

In respect to the second point, it is, I think, sufficient to say that it appears from the evidence that the purpose of the consumers of the water under the company's system, all of whom were defendants to the suit of Lanning v. Osborne, supra, in procuring outside taxpayers to petition the board of supervisors for the establishment of rates, was to avoid any and all acquiescence in the power of the board to establish such rates, and to continue their contention that the company was estopped from changing the irrigation rate of $3.50 per acre per annum, without subjecting themselves to a charge of inconsistency of position, and at the same time to secure a lower rate than that fixed by the receiver of the company's property. The act of the legislature of California approved March 12, 1885, authorizes any 25 inhabitants who are taxpayers of the county to initiate proceedings, and does not limit the right to those who are actual consumers of the water, the rates of which they may seek to have fixed by the board of supervisors. Under these circumstances, I am of opinion that the point suggested is not well taken.

The last and principal point in the case is, like all questions of the kind, perplexing and embarrassing; for, while I would not hesitate to annul any ordinance that fixes rates which in effect clearly operate to take one's property without just compensation, contrary to the provisions of the constitution of the United States, the court must not lose sight of the fact that the question is primarily one for the determination of the legislature, or of some public agency designated by it,—in the present instance, the board of supervisors of San Diego county. The rule by which the courts must be governed in such cases has been many times declared, and was stated by the supreme court in the case of San Diego Land & Town Co. v. City of National City, 174 U. S. 753, 19 Sup. Ct. 804, 43 L. Ed. 1154, in these words:

"That it was competent for the state of California to declare that the use of all water appropriated for sale, rental, or distribution should be a public use, and subject to public regulation and control, and that it could confer upon the proper municipal corporation power to fix the rates of compensation to be collected for the use of water supplied to any city, county, or town, or to the inhabitants thereof, is not disputed. and is not, as we think, to be doubted. It is equally clear that this power could not be exercised arbitrarily, and without reference to what was just and reasonable as between the public and those who appropriated water and supplied it for general use; for the state cannot, by any of its agencies, legislative, executive, or judicial, withhold from the owners of private property just compensation for its use. That would be a deprivation of property without due process of law. Chicago, B. & Q. R. Co. v. City of Chicago, 166 U. S. 226, 17 Sup.

Ct. 581, 41 L. Ed. 979; Smyth v. Ames, 169 U. S. 466, 524, 18 Sup. Ct. 418, 42 L. Ed. 819. But it should also be remembered that the judiciary ought not to interfere with the collection of rates established under legislative sanction unless they are so plainly and palpably unreasonable as to make their enforcement equivalent to the taking of property for public use without such compensation as under all the circumstances is just both to the owner and to the public; that is, judicial interference should never occur unless the case presents, clearly and beyond all doubt, such a flagrant attack upon the rights of property under the guise of regulations as to compel the court to say that the rates prescribed will necessarily have the effect to deny just compensation for private property taken for the public use."

What the company is entitled to demand in order that it may have just compensation is, as said in the case last cited, "a fair return upon the reasonable value of the property at the time it is being used for the public." And unless the act of the legislature of California of March 12, 1885, makes the cost of the plant here in question the test of its value, that value must be determined upon a consideration of all of the facts and circumstances of the case. In that determination, said this court in San Diego Land & Town Co. v. City of National City, 74 Fed. 83—

"Many considerations may enter,—among them, the amount of money actually invested. But that is by no means, of itself, controlling, even where the property was at the time fairly worth what it cost. If it has since enhanced in value, those who invested their money in it, like others who invest their money in any other kind of property, are justly entitled to the benefit of the increased value. If, on the other hand, the property has decreased in value, it is but right that those who invested their money in it, and took the chances of an increase in value, should bear the burden of the decrease. In my judgment, it is the actual value of the property at the time the rates are to be fixed that should form the basis upon which to compute just rates; having, at the same time, due regard to the rights of the public and to the cost of maintenance of the plant, and its depreciation by reason of wear and tear."

I adhere to those views, and think them confirmed by the decisions of the supreme court above cited. The rates, as has been seen, are to be just at the time they are fixed; and what are just rates depends, as has been said, in large measure, upon the reasonable value of the property used in supplying the water to the public. The actual value of such property obviously depends upon a variety of considerations,—among them, the actual and prospective number of consumers,—and is no more unchangeable than the value of any other kind of property; and that fact seems to have been recognized by the legislature of California in enacting the law of March 12, 1885, where provision is made, as has been seen, for the abrogation of the rates once fixed, after the expiration of 12 months, and the establishment of new rates, upon either the written petition of 25 of the inhabitants who are taxpayers of the county, or upon that of the company or person furnishing the water. The evidence before the court shows that at the time the rates in question were fixed the company's supply of water had, by reason of the then prevailing drought in Southern California, very largely decreased, and soon thereafter entirely ceased, so that, while the cost of the system undoubtedly remained the same, it cannot, I think, be justly held that its reasonable value, for the time being, at least, was not largely de-

creased; for, however much a water plant may have cost, its chief value disappears with the disappearance of the water for the transmission and sale of which it was constructed. Upon the return of the normal rainfall, the value of this property, like that of many other properties which have been injuriously affected in value by the unusual and severe droughts that have recently prevailed in this section of the country, will undoubtedly largely increase, which conditions should, and doubtless will, have due consideration when water rates are again required to be fixed. While in such matters, as in some others, absolute justice is, perhaps, unattainable, certainly as near an approach to it ought to be made as is practicable. This can only be done by all parties in interest approaching the problem in a spirit of fairness. It would seem from the testimony of Mr. Cherry, a member of the board that fixed the rates in question, that the board fixed its valuation of the company's plant at $350,000 largely upon a consideration of its assessed value of $155,000 for the purposes of taxation, and upon what the board thought was a fair proportion to be attributed to the water plant of the $889,163.33 for which the complainant acquired the entire property of the Kansas corporation; that it estimated and allowed for the maintenance and operation of the plant $13,442 a year; and that it estimated that the company's supply of water would irrigate 6,080 acres of land outside of National City, and found that it would receive $13,162 annually from the sale of water within that city. The board accordingly fixed $3.50 per acre as the annual rate to be paid for water for irrigation outside of National City, which, together with the amount received by the company for water furnished within that city, would meet the cost of maintenance and operation, and pay a little more than 6 per cent. per annum upon a valuation of the plant of $350,000. It is insisted on the part of the complainant that the board of supervisors made no allowance for the deterioration of the plant, and that the evidence plainly shows that the soil in which the pipes of this company are laid is of such a nature that the pipes rust and otherwise deteriorate much more rapidly than similar pipes in other soils, and require to be relaid in from 10 to 20 years. The evidence undoubtedly so shows, and that fact should be given due consideration in fixing rates and in determining their reasonableness; but it is not just, I think, to charge all of the consequences of that unfortunate state of affairs to the consumers. To some extent, at least, it goes to lessen the value of the plant itself, and this fact must be given consideration by the court in deciding upon the effect of the action of the board of supervisors; for it must be remembered that it is the result of its action as embodied in the ordinance that is the subject for the determination of the court, not the processes by which it reached its conclusion. In view of all of the facts and circumstances of the case as disclosed by the evidence, and especially in view of the small quantity of water available for use and actually furnished for irrigation outside of National City at the time the rates in question were fixed, which amount constantly decreased to the point of exhaustion, I do not think the court would be justified in holding it to be clear that the rates fixed by the board of supervisors will necessarily have the

effect of depriving the complainant of its property without just compensation, unless it be, as is contended on the part of the complainant in another and similar suit pending in this court, and now under submission, entitled E. H. Spoor, Receiver, against Board of Supervisors of Riverside County, et al., that the statute of California above cited, and by virtue of which the proceedings before the supervisors were had, itself makes the cost of the plant the test of its value. That question remains to be considered. It is quite evident, as urged by counsel in the Riverside case, from the provision of the statute in respect to interest, that the purpose of the legislature was to encourage the investment of capital in such water systems, and thereby promote the development and settlement of the state. That provision is that "said boards of supervisors, in fixing such rates, shall, as near as may be, so adjust them that the net annual receipts and profits thereof to the said persons, companies, associations, and corporations so furnishing such water to such inhabitants shall be not less than six per cent. nor more than eighteen per cent.,"—not, however, as said by counsel, "upon the cost of the system," but "upon the said value of the canals, ditches, flumes, chutes, and all other property actually used and useful to the appropriation and furnishing of such water," etc.; that is to say, the value of the canals, ditches, flumes, water chutes, and all other property actually used and useful to the appropriation and furnishing of such water belonging to and possessed by the company or person furnishing it that the board of supervisors is, by the fourth section of the act, required to "estimate as near as may be"; being given power, to that end, as well as for the purpose of estimating the "annual reasonable expenses, including the cost of repairs, management and operating such works," to require the attendance of persons to give evidence, as also the production of papers, books, and accounts. If the legislature had intended to make the cost of the plant the test of its value, it would have been the simplest sort of thing to have said so. But this it did not do. It is true that in section 5 of the act it does seem to require the board of supervisors, acting in pursuance of its provisions, to accept the cost of "any extensions, enlargements or other permanent improvements" to the system as the value of such improvements; for the provision requiring the board to so adjust the rates as that the net annual receipts and profits shall be not less than 6 nor more than 18 per cent. of the value of the property is followed by this declaration:

"But in estimating such net receipts and profits the cost of any extensions, enlargements or other permanent improvements of such water rights or water works shall not be included as part of the said expenses of management, repairs and operating of such works, but when accomplished may and shall be included in the present cost and cash value of such work."

It is said that the words "present cost," here used, indicate that it was intended by the legislature to make the cost of the entire plant the test of its value. But in view of the other provisions of the act above referred to, and in view of the fact that it would have been a very simple matter for the legislature to have said that the cost of the plant should be taken as its value, if it had so intended, I think the

court would not be justified in giving to the words "present cost," used in the clause quoted, that effect. Those words, in the connection in which they are used, seem to be out of place, and their meaning is very indefinite and uncertain. As already observed, the clause last quoted does seem to require the cost "of any extensions, enlargements or other permanent improvements" to the plant to be accepted as their value. But such permanent improvements in the case at bar constitute but a small part of the complainant's plant.

Looking at the whole case, as the court must, I am unable to say that the rates prescribed by the board of supervisors here complained of will necessarily have the effect to deny just compensation to the complainant for the use of its property. Accordingly there must be a decree dismissing the bill at the complainant's cost. It is so ordered.